OPINION OF THE COURT
 

 Titone, J.
 

 In each of these three cases, the defendant unsuccessfully sought to introduce hearsay statements that were made in the course of 911 calls on the theory that those statements qualified for admission as "present sense impressions.” The appeals from the Appellate Division orders affirming defendants’ convictions require us to consider the precise contours of the criteria for present sense impressions that we outlined in
 
 People Brown
 
 (80 NY2d 729) and
 
 People v Buie
 
 (86 NY2d 501). Since these criteria were not satisfied by the offers of proof in the three cases before us, we conclude that the courts below did not err in their respective decisions to exclude the proffered evidence.
 

 L
 

 People v Vasquez
 

 Defendant was charged with reckless first degree endangerment and second and third degree criminal possession of a weapon. The charges arose out of an October 19, 1989 incident in which an individual standing near the intersection of 9th Street and Avenue C in Manhattan allegedly fired several shots at a passing passenger vehicle. According to the prosecution’s evidence, the incident was witnessed by Peter Torres and Nancy Alfaro. Torres and Alfaro were riding in a white car when they first noticed an individual whom they identified as defendant exiting a nearby building. Torres stopped the car when he saw defendant "come up” with a "big” revolver. He continued to watch as defendant, whom he described as having an "intense expression,” fired four shots, "following the car” from left to right as he fired. Torres saw defendant stagger and stumble away until he was "ushered” into a nearby pool hall
 
 *570
 
 by some men who were standing outside. At that point, Torres and Alfaro drove away, found a radio motor patrol car and reported the shooting, describing the shooter as an "older” "drunk” male Hispanic with a brown or black coat.
 

 En route to the spot where the reported shooting had occurred, the officers received radio reports about the incident. These officers and several others in radio motor patrol cars converged at the scene. Torres spoke with an Officer Reuss and then accompanied him and the other officers to the pool hall. Shortly after they entered, an officer saw defendant, who fit Torres’s description, exiting a small, single-stall bathroom in the back. A brief inspection of the bathroom revealed a revolver that had been placed on the floor behind the toilet and four spent shells inside the toilet itself. Following this discovery, the officers seized and searched defendant, recovering two bullets from his right pants pocket.
 

 The identity of the shooter and the character of the shooting incident itself were challenged by the defense, which relied heavily on testimony from one Jose Tirado. Tirado, who had been "good friend[s]” with defendant for more than 25 years, stated that he saw a man argue with several others on the street and then return a few minutes later in a white car to chase his antagonists with the vehicle. After two passes through the area, the white car stopped and its driver entered into an argument with an individual whom Tirado described as "very dark” complected, "like a black with an Afro.” Suddenly, Tirado stated, the two men fired guns at each other and the one with the Afro ran across the street into the nearby pool hall. At some point thereafter, the man with the white car came back, followed by several patrol cars, and directed the police into the pool hall. Tirado stated that he had seen defendant earlier in the evening and had warned him to stay inside the pool hall to avoid the rampaging white car. At the time of the shooting, according to Tirado, defendant was in the pool hall.
 

 During the trial, defense counsel tried at several points to introduce an audiotape of a 911 call that had been made to police by an anonymous caller, assertedly "at the same time the incident t[oak] place.” In the transcript of this tape, the caller reported that seven shots were fired. When asked whether there were any injuries, the caller answered in the negative and then stated that there was a black man wearing a black jacket "returning” and fleeing north on Avenue C. In support of his claim for admission of the tape, counsel argued that its
 
 *571
 
 contents were admissible under either the present sense impression or the excited utterance exception to rule against hearsay. Alternatively, counsel argued that the 911 call, or at least the radio run that was broadcast in response to the 911 call, was admissible to explain why the officers who had not spoken to Torres had gone to the scene of the shooting. Counsel’s efforts to secure admission of the contents of the 911 call and the associated radio run were repeatedly rebuffed.
 

 Following the trial, defendant was convicted of the charged crimes and sentenced to a 21 year to life term of imprisonment. On his appeal from the judgment of conviction, the Appellate Division affirmed, holding that defendant had failed to lay a proper foundation for the admission of the 911 call as an excited utterance and that the call’s contents could not be admitted under the present sense impression exception because the requisite corroboration had not been established. Defendant subsequently obtained leave to take a further appeal from a Judge of this Court.
 

 People v Dalton
 

 The homicide charges in defendant Dalton’s case arose out of a violent altercation that took place just outside defendant’s apartment on October 25, 1991. According to the People’s trial evidence, the victim, Michael Sharib, who had been defendant’s close friend for several years, had earlier accused defendant of burglarizing his family’s home. Believing that Sharib was contemplating taking revenge, defendant, who was then 14 years old, arranged to purchase a gun.
 

 On the evening of the incident, the 15-year-old Sharib, accompanied by several friends, approached defendant on the street outside of his apartment building, grabbed him by the clothes and began screaming at him about the burglary. Sharib eventually released defendant, but the argument continued until Sharib finally told defendant that if he had not committed the burglary, he should find out who did. Sharib had begun to walk away when defendant suddenly ran toward him and fired two shots from a small handgun just as Sharib turned to face him. When Sharib fell to the ground, defendant walked over to him, kicked him and then fired another shot, stating 'T hope you die.” Defendant ran into his apartment. Defendant’s mother, who arrived on the scene at some point after the shooting, picked the gun up from the ground. She subsequently cooperated with the police, directing them to defendant, who was still in the house and was in an extremely upset and agi
 
 *572
 
 toted state. Defendant was treated by EMS workers and then arrested. Sharib died as a result of his injuries.
 

 Testifying on his own behalf, defendant stated that Sharib had threatened him with a knife a few days before the shooting. Although he was very nervous and concerned that Sharib would attack him, defendant stated that he did not attempt to acquire a weapon of his own after this incident. According to defendant, the altercation that led to the shooting began when Sharib and his friends surrounded him on the street and threatened him. He tried to run away, but was hit in the back of the head with a hard object. Dizzy from the blow, defendant ran to a nearby store. "When he turned, he saw Sharib standing only a few feet away and pointing a gun at his chest. When Sharib’s attention was momentarily diverted by defendant’s mother’s arrival, defendant kicked him in the groin, causing him to drop his gun. According to defendant, Sharib then attacked defendant’s mother. Fearing that Sharib would hurt his mother with the knife he had seen several days earlier, defendant fired the gun. After the initial confusion, defendant complied with his mother’s request that he give her the gun. Defendant then ran into his house and called 911.
 

 Defendant’s version of events was corroborated by his mother, who also described his state of extreme distress following the shooting. Additionally, an EMS technician testified for the defense, confirming the defendant was very upset and that he had a lump on his head when he was examined after the incident.
 

 To bolster the defense position, counsel asked for permission to introduce the tape of defendant’s 911 call as either an excited utterance or a present sense impression. Having made this call within minutes of the shooting, defendant told the operator that someone had been shot, gave the operator some identifying details and stated, in response to a question, that the victim had "hit [him] and bashed [his] head in the door.” When asked who had shot the victim, defendant said: "I did. I took the gun off him. He smacked me in the back of the head with a gun.” The trial court denied counsel’s request, concluding that the statements had been made after defendant had had an opportunity to reflect and that they therefore lacked "indicia of reliability.” Counsel’s subsequent efforts to introduce the 911 tape as evidence of defendant’s "state of mind” were also rebuffed.
 

 Defendant was ultimately convicted of second degree murder and sentenced as a juvenile offender to a seven year to life
 
 *573
 
 term of imprisonment. The Appellate Division unanimously affirmed the conviction. This appeal, taken by permission of a Judge of this Court, ensued.
 

 People v Adkinson
 

 The defendant in this case was convicted of having sexually abused a 10-year-old boy on the roof of the boy’s apartment building. Although the boy identified defendant as his attacker, the identification testimony was challenged at trial because of several discrepancies in the child’s description of the perpetrator and because of questions about the child’s actual opportunity to observe his assailant’s face. To support the proffered defense of misidentification, defense counsel sought to introduce a tape of the 911 call that the victim’s aunt had made on his behalf when he returned to his apartment immediately after the assault. During this call, the victim’s aunt related the 911 operator’s questions to him and then repeated the boy’s responses. The victim’s own responses were audible on much of the tape. At one point in the tape, the victim reportedly stated in response to a specific question that he had been unable to see the face of the man who attacked him. Counsel’s arguments that the tape should be admitted under the present sense impression exception to the hearsay rule were rejected.
 

 Defendant was convicted of the 12 counts in the indictment, and the Appellate Division affirmed the conviction, holding that the 911 tape was inadmissible because the victim’s aunt was not an eyewitness to the crime. Having obtained the permission of a member of this Court, defendant took the present appeal.
 

 IL
 

 The common issue in these three appeals is the proper application of the present sense impression exception to the hearsay rule that was recognized by this Court in
 
 People v Brown (supra)
 
 and elaborated upon in
 
 People v Buie
 
 (86 NY2d 501,
 
 supra).
 
 Initially, we note that our analysis as to whether a particular out-of-court statement should have been admitted under this exception does not depend on whether the trial was conducted before or after our decision in
 
 Brown
 
 was announced. Under traditional common-law principles, cases on direct appeal are generally decided in accordance with the law as it exists at the time the appellate decision is made
 
 (People v Favor,
 
 82 NY2d 254, 260-261;
 
 Gurnee v Aetna Life & Cas. Co.,
 
 55 NY2d 184). While a different approach may be applied in cases involving certain "new” rules of law that represent sharp
 
 *574
 
 departures from precedent or raise concerns about the orderly administration of justice (e.g.,
 
 People v Mitchell,
 
 80 NY2d 519;
 
 see generally, People v Pepper,
 
 53 NY2d 213), none of the relevant factors supporting such exceptional treatment is present in this situation, which involves only an additional wrinkle in the complex body of evidentiary law governing the admission of hearsay. Thus, as long as the record is adequately developed and the issue has been preserved through timely and sufficiently specific comments by counsel, the fact that the
 
 Brown
 
 decision was not handed down until after trial presents no impediment to appellate application of the present sense impression exception to the facts of a particular case.
 

 The "present sense impression” exception is a close relative of the analytically similar "excited utterance” exception to the rule against the admission of hearsay. Indeed, both are members of a larger category of exceptions that were formerly grouped together and classified, inaptly, as res gestae (2 McCormick, Evidence § 268 [Strong 4th ed]). "Present sense impression” statements and "excited utterances” are both often loosely described, sometimes misleadingly, as "spontaneous” statements
 
 (see generally, id.,
 
 §§ 270, 271). The imprecise use of that adjective, however, should not be permitted to obscure the critical distinction between the two exceptions: the underlying reliability factor that justifies their admission.
 

 "Excited utterances” are the product of the declarant’s exposure to a startling or upsetting event that is sufficiently powerful to render the observer’s normal reflective processes inoperative
 
 (id.,
 
 at 216;
 
 see, People v Brown,
 
 70 NY2d 513, 518;
 
 People v Edwards,
 
 47 NY2d 493, 497; Fisch, New York Evidence § 1000 [2d ed]). "Present sense impression” declarations, in contrast, are descriptions of events made by a person who is perceiving the event as it is unfolding. They are deemed reliable not because of the declarant’s excited mental state but rather because the contemporaneity of the communication minimizes the opportunity for calculated misstatement as well as the risk of inaccuracy from faulty memory
 
 (see, People v Brown,
 
 80 NY2d, at 732-733; Comment of NY Law Rev Commn, reprinted in Proposed NY Code of Evidence § 804, at 211-212 [1982]; McCormick,
 
 op. cit.,
 
 at 212). In our State, we have added a requirement of corroboration to bolster these assurances of reliability
 
 (see, People v Brown,
 
 80 NY2d, at 734-735;
 
 see generally,
 
 Waltz,
 
 The Present Sense Impression Exception to the Rule Against Hearsay: Origins and Attributes,
 
 66 Iowa L Rev 869, 883). Thus, while the key components of "excited utterances”
 
 *575
 
 are their spontaneity and the declarant’s excited mental state, the key components of "present sense impressions” are contemporaneity and corroboration.
 

 We have stated that the present sense impression exception is available when the statement describes or explains an event or condition and was "made while the declarant was perceiving the event or condition,
 
 or immediately
 
 thereafter”
 
 (People v Brown,
 
 80 NY2d, at 732 [emphasis supplied]). The italicized language, however, was meant to suggest only that the description and the event need not be precisely simultaneous, since it is virtually impossible to describe a rapidly unfolding series of events without some delay between the occurrence and the observer’s utterance. The language in question was certainly not intended to suggest that declarations can qualify as present sense impressions even when they are made after the event being described has concluded. Indeed, we noted in
 
 Brown
 
 that the description of events must be made "substantially contemporaneously” with the observations
 
 (id.,
 
 at 734).
 

 Thus, although we recognize that there must be some room for a marginal time lag between the event and the declarant’s description of that event, that recognition does not obviate the basic need for a communication that reflects a
 
 present
 
 sense impression rather than a recalled or recast description of events that were observed in the recent past. Without satisfaction of this requirement, the essential assurance of reliability— the absence of time for reflection and the reduced likelihood of faulty recollection — is negated and there is then nothing to distinguish the declaration from any other postevent out-of-court statement that is offered for the truth of its contents.
 

 The corroboration element of the present sense impression exception is more complex and concomitantly more difficult to delineate. The general idea, as we stated in
 
 Brown (supra,
 
 80 NY2d, at 734), is that there must be some independent verification of the declarant’s descriptions of the unfolding events. Although we stated in
 
 People v Brown
 
 (80 NY2d, at 737) that "there must be some evidence * * * that the statements sought to be admitted were made spontaneously and contemporaneously with the events described,” we did not mean by that language that such proof would suffice to satisfy the entirely separate requirement that the content of the communication be corroborated by independent proof. Rather, we merely intended to reiterate the basic foundational requirements for admitting an out-of-court declaration purporting to be a
 
 "present
 
 sense impression.” Accordingly, contrary to appellants’
 
 *576
 
 arguments here, the corroboration element cannot be established merely by showing that the declarant’s statements were unprompted and were made at or about the time of the reported event.
 

 The extent to which the content of the declaration must be corroborated by extrinsic proof is, as we have previously said, dependent on the particular circumstances of the individual case
 
 (People v Brown,
 
 80 NY2d, at 737). Because of the myriad of situations in which the problem may arise, it would not be productive to attempt to fashion a definitive template for general application. It is sufficient at this point to note that in all cases the critical inquiry should be whether the corroboration offered to support admission of the statement truly serves to support its substance and content.
 

 IIL
 

 People v Vasquez
 

 Application of the foregoing principles leads to the conclusion that no error was committed in the exclusion of the 911 tape that defendant proffered. Even assuming that the anonymous 911 call was made during the crime or in its immediate aftermath and that it was made by an on-the-scene observer who related events as he witnessed them, the statements in question did not qualify as admissible present sense impressions because they were not sufficiently corroborated by independent proof.
 

 The "corroborative” evidence on which defendant relies is the testimony of the defense witness Tirado, who had described the shooter as a black man with a very dark complexion and an Afro hairdo. The problem with defendant’s theory is that, apart from their common reference to a black man having been at the scene, Tirado’s testimony and the 911 caller’s statements did not intersect at all. While the black man whom Tirado described as the shooter ran across the street and into the pool hall after the shooting, the black man the 911 caller described fled north on Avenue C. This discrepancy suggests that Tirado and the caller may not even have been describing the same individual. Thus, although there may have been proof that the 911 caller’s statements were made contemporaneously with the described events, the content of those statements was not corroborated by Tirado’s testimony or any other evidence. Consequently, the hearsay statements were not admissible under the present sense impression exception.
 

 Similarly, the trial court properly refused to admit both the 911 tape and the radio transmission that was broadcast in
 
 *577
 
 response to it on the theory that the "door” to the admission of such evidence was opened because the police officers testified that they had received a radio broadcast with a description of the shooter and had gone to the scene of the shooting in response to that broadcast. The trial evidence indicates that there were two separate messages broadcast: one that was broadcast from "Central” in response to the 911 call and another that was broadcast from the field by the officers who had spoken to the eyewitnesses Torres and Alfaro. To the extent that the two receiving officers made brief reference in their direct trial testimony to a radio message containing a description, there was no evidence that the message in question was the one that was broadcast from" Central” rather than the separate one that was broadcast from the field. Thus, the record does not support defendant’s present claim.
 

 The inadequacy of the record on this point also defeats defendant’s arguments regarding testimony by one of the officers that he had made, but no longer had, a hastily jotted down note of the radio transmission’s contents. Once again, it is unclear from the existing record whether the transmission reflected in the note was the one from "Central,” which mentioned a "black man,” or was instead the one from the field officer who spoke to Torres and which described the shooter as Hispanic. Because of this record ambiguity, there is no support for defendant’s argument that he was prejudiced by the note’s unavailability because its contents "would have provided a fertile ground for impeachment.” Thus, defendant’s present claim that he was erroneously denied the remedy he sought, i.e., an adverse inference instruction, does not furnish a persuasive ground for reversal. As we have previously noted, the touchstone for determining the remedy for the loss of
 
 Rosario
 
 material is the existence and degree of prejudice resulting from the loss (see,
 
 People v Wallace,
 
 76 NY2d 953;
 
 People v Martinez,
 
 71 NY2d 937).
 
 [1]
 

 Finally, there is no merit to defendant’s contention that reversible error was committed when the prosecutor elicited from Tirado, a key defense witness, that defendant had been incarcerated in the months preceding the trial. The informa
 
 *578
 
 tian about defendant’s pretrial incarceration was volunteered by Tirado during the course of an entirely proper line of questions regarding Tirado’s failure to come forward with his exculpatory story at some earlier point. The prosecutor was attempting to establish the foundation required by
 
 People v Dawson
 
 (50 NY2d 311) by demonstrating that Tirado, defendant’s long-term friend, knew that defendant had been accused of the crime that Tirado had claimed was committed by someone else. The prosecutor’s strategy in this regard was to show that Tirado must have known about defendant’s predicament because he was present at pretrial proceedings connected with the case, including defendant’s bail hearing. In pursuing that strategy, the prosecutor attempted to avoid prejudicial references to defendant’s pretrial incarceration through careful phrasing of his questions. It was only when the witness gave , a series of evasive answers that the prosecutor’s questions became more pointed. Even then, the information that was conveyed — i.e., that there had been a hearing to determine whether defendant should be released and that Tirado had visited his friend in the courthouse — was relatively innocuous and provides no basis for inferring that defendant was prejudiced. Thus, the line of questioning of which defendant complains is not a ground for reversal
 
 (see, People v Jenkins,
 
 88 NY2d 948 [decided herewith]).
 

 People v Dalton
 

 Defendant Dalton’s appeal is predicated solely on the exclusion from evidence of the contents of his own 911 call to police, which he made a few minutes after the shooting. As defendant notes, admission of this hearsay proof would have been helpful to the defense because it would have provided some support for defendant’s assertion that he had acted in defense of himself and his mother after he had been hit on the head with a gun and had taken the gun away from the victim.
 

 Contrary to defendant’s contentions, the 911 tape was not admissible as a present sense impression for the simple reason that the statements it contained were not made contemporaneously or even substantially contemporaneously with the events they described. Instead, they were made after the entire sequence of events had come to a final and fatal end and defendant had run from the crime scene. At that point, it could no longer be said that defendant’s statements were a description of his "present sense impressions” as his observations were made. Further, it could not be said that the lapse in time between the observations and the statements "le[ft] no time for
 
 *579
 
 reflection”
 
 (People v Brown, supra,
 
 80 NY2d, at 733). Accordingly, even assuming that they were sufficiently corroborated by independent proof, the statements in the 911 tape lacked the fundamental indicia of reliability that might have arguably justified their admission.
 

 Defendant’s arguments based on the "excited utterance” exception to the rule against hearsay fare no better. An excited utterance is one made "under the immediate and uncontrolled domination of the senses, and during the brief period when consideration of self-interest could not have been brought fully to bear by reasoned reflection”
 
 (People v Brown, supra,
 
 70 NY2d, at 518). The existence of a physical shock or trauma has often been cited as a key consideration
 
 (see, People v Brooks,
 
 71 NY2d 877;
 
 People v Brown,
 
 70 NY2d, at 516-517; 6 Wigmore, Evidence § 1745 [1] [Chadbourn rev ed]). While the statement must have been made before the declarant had the opportunity to reflect, " 'the time for reflection is not measured in minutes or seconds,’ ” but rather " 'is measured by facts.’ ”
 
 (People v Marks,
 
 6 NY2d 67, 72,
 
 cert denied
 
 362 US 912;
 
 People v Norton,
 
 164 AD2d 343, 353,
 
 affd
 
 79 NY2d 808.) The court must assess "not only the nature of the startling event and the amount of time which has elapsed between the occurrence and the statement, but also the activities of the declarant in the interim”
 
 (People v Edwards,
 
 47 NY2d 493, 497,
 
 supra).
 

 Here, the facts are that defendant, the declarant, had suffered only a minor physical trauma, i.e., a bump on the head. Moreover, although the time between the incident and the making of the disputed statements was brief, defendant had had time to run to his mother, give her the gun and then exchange the scene of the incident for the familiar surroundings of his own home before making the 911 call. Further, while defendant may have made the phone call and the initial statement that "somebody’s been shot” without prompting, the subsequent critical statements were made after defendant had accurately and coherently answered a series of identifying questions about himself and the victim. Thus, although there was evidence that defendant was very upset in the minutes and hours after the shooting, the record does not suggest that he was so agitated that he was unable to reflect or fabricate at the time he had made the 911 call.
 

 Given defendant’s opportunity to reflect and his powerful motive to exculpate himself when he reported the shooting to police, his statements to the 911 operator cannot be deemed to have the trustworthiness required for admissible "excited ut
 
 *580
 
 terances.” Moreover, contrary to defendant’s arguments, the 911 statement was not admissible as proof of his state of mind at the time of the shooting, since it was made after that event occurred and its relevance to defendant’s prior mental state depended entirely on the truth of its contents. Accordingly, the statement’s exclusion from evidence was not error and the order of the Appellate Division affirming the judgment of conviction should itself be affirmed.
 

 People v Adkinson
 

 As in the
 
 Dalton
 
 case, defendant’s efforts in this case to obtain a reversal because of the exclusion of the contents of a 911 tape must fail because the critical element of contemporaneity is absent. The statements on which the
 
 Adkinson
 
 defendant relies are those which were made by the victim to his aunt as she spoke to the 911 operator several minutes after the assault took place. The most important of these is the victim’s statement that he had not actually seen his assailant’s face — an admission that was inconsistent with the victim’s identification testimony.
 

 The problem with defendant’s argument is that, like the 911 call in
 
 Dalton,
 
 the 911 call in question here took place after the events that were being described had come to an end and the declarant had removed himself to a different locale. Under these circumstances, the proffered statements could not rationally be characterized as recitations of an observer’s
 
 present
 
 sense impressions.
 

 Defendant is also in error when he argues that there was insufficient proof to establish his guilt of second degree assault under Penal Law § 120.05 (2). Contrary to defendant’s contentions, a rational fact finder could conclude that the wad of paper towels that defendant had used to gag his 10-year-old victim during the assault was a "dangerous instrument” within the meaning of Penal Law § 10.00 (13). This ordinarily innocuous household item had been wadded up with rubber bands to create a dense ball that was shoved into the victim’s mouth with sufficient force to break a tooth and, presumably, to prevent the victim, whose hands were bound, from spitting it out. Used in this manner, the wad of paper towels was certainly capable of causing serious physical injury to the young victim
 
 (see, People v Cwikla,
 
 60 AD2d 40, 44,
 
 revd on other grounds
 
 46 NY2d 434;
 
 see generally, People v Carter,
 
 53 NY2d 113, 116).
 

 Although there is no basis to reverse any of defendant’s convictions we agree with defendant that his sentence was
 
 *581
 
 improperly altered after its service began
 
 (see,
 
 CPL 430.10). At sentencing, the trial court stated that counts 5, 6 and 11 were each consecutive to counts 1 and 2, but no mention was made of how counts 5, 6 and 11 were to run in relation to each other. Accordingly, under the plain language of Penal Law § 70.25 (1) (a), these counts were concurrent to each other. Since there is no proof on the record that the court misspoke or that its failure to designate counts 5, 6 and 11 as "consecutive” with respect to each other was accidental, there was no basis for any subsequent change in the sentence to reflect a consecutive relationship among the sentences for those counts
 
 (cf., People v Wright,
 
 56 NY2d 613;
 
 People v Minaya,
 
 54 NY2d 360, 364-365). Thus, to the extent that the commitment order and the amended commitment order signed by the court indicate that counts 5 and 11 are consecutive to each other, those orders represent an unauthorized alteration of defendant’s sentence and should be modified to reflect that those two counts are concurrent to each other.
 
 [2]
 

 Accordingly, in
 
 People v Vasquez
 
 and
 
 People v Dalton,
 
 the orders of the Appellate Division should be affirmed; in
 
 People v Adkinson,
 
 the order of the Appellate Division should be modified in accordance with this opinion and otherwise affirmed.
 

 Chief Judge Kaye and Judges Simons, Bellacosa, Smith, Levine and Ciparick concur.
 

 In
 
 People v Vasquez
 
 and
 
 People v Dalton:
 
 Order affirmed.
 

 In
 
 People v Adkinson:
 
 Order modified in accordance with the opinion herein and, as so modified, affirmed.
 

 [1]
 

 . We note that this is not a situation in which the lack of information about a lost document’s contents is itself the result of the authority’s negligence in losing or destroying it (see,
 
 People v Joseph,
 
 86 NY2d 565). In this case, defense counsel could have eliminated the ambiguity of the record by simply asking the testifying officer about the source of the radioed message that he had summarized in the missing note.
 

 [2]
 

 . According to defendant, the People have conceded that that count 6 was based on the same facts as count 1 and that, accordingly, it was required to run concurrently with that count. Thus, count 6 is not in issue in this appeal and, in fact, its concurrent status is reflected in the amended commitment order.