Bellacosa, J.
(dissenting). Respectfully, I vote to affirm the order of the Appellate Division. It upheld all the disputed counts charged against the defendant (248 AD2d 491 [Rosenblatt, J. P., Ritter and Goldstein, JJ.; O’Brien, J., dissenting]). So would I.
I
Defendant was charged with forcing his way into his estranged wife’s apartment. There, in the presence of her three children, he started a fight with Michael Samuel, punching him in the face and the chest and wrestling him to the floor. Defendant’s wife and another woman managed to drag defendant off Samuel, but not before defendant bit Samuel’s left index finger to the bone, severing nerves in the finger and causing serious permanent injuries.
Defendant was indicted on 13 counts stemming from the incident. Four of these counts — burglary in the first degree (Penal Law § 140.30 [3]); burglary in the second degree (Penal Law § 140.25 [1] [c]); assault in the second degree (Penal Law § 120.05 [2]); assault in the third degree (Penal Law § 120.00 [3]) — require as an element of the crime that the perpetrator have employed a “dangerous instrument”.
The only question in this purely statutory interpretation appeal, affecting four serious counts of the indictment against defendant, is whether defendant’s teeth constituted a “dangerous instrument,” as that term is defined in the pertinent statutes of the Penal Law.
*407 The Majority rules not only that defendant’s teeth did not constitute an “instrument” in this case, but also that, as a matter of law, under no circumstances may any part of any person’s natural body ever qualify as a “dangerous instrument” — the full statutory phrase. By this holding, the Majority substantially subtracts from the statute, while materially augmenting the breadth of People v Vollmer (299 NY 347), and disregarding the import of People v Carter (53 NY2d 113, 115). In breaking this new ground, the Majority dysfunctionally discounts the role and powers of prosecutors who screen out the quality and gravity of particular charges they present to a Grand Jury, and disregards a petit jury’s ability to differentiate when someone’s teeth are just the human instrument for chewing, and when an accused uses them as a dangerous criminal instrument. The reversal analysis is, thus, substantially outweighed by an array of countervailing authorities supporting the affirmance that I urge.
In sum, the Majority’s per se holding contradicts:
• the plain, unqualified words of the statute;
• the more cogent legislative history, if that source must be used;
• well-settled statutory interpretation precedents that circumscribe judicial activity reserved to the legislative realm;
• practical context and realistic application of the prosecutorial tool;
• and last, but not least, common sense.
Yet, the Majority summarily dismisses these complementary affirmance points, while this lone dissenter maintains that each ground is quite cogent in supporting a more measured resolution of this case and its key issue.
II
I begin my assessment with the legislatively decreed plain language definition of a “dangerous instrument”: “ ‘Dangerous instrument’ means any instrument, article or substance, including a ‘vehicle’ as that term is defined in this section, which, under the circumstances in which it is used, attempted to be used or threatened to be used, is readily capable of causing death or other serious physical injury” (Penal Law § 10.00 [13]). The Majority finds it necessary to search beneath the *408 embracive and. unconditional statutory language. Its eschewal of the orderly, threshold plain language rubric, in judicial statutory interpretive analysis, is seriously unsettling in and of itself.
Anything that can be used to cause death or serious injury fits within the meaning of the sweeping statutory words, the only controlling definition. Undeniably, too, the statutory formula contains no exclusion for parts of the human body or for anything else for that matter. Thus, carving a substantive and categorical exclusion out of the statute is beyond this Court’s allocated role in the distribution of lawmaking authority; it seems to me that what is being done here is nothing less than the functional equivalent of judicial legislation[1] (see, People v Finnegan, 85 NY2d 53, 58, cert denied 516 US 919 [noting the well-settled principles that “courts are not to legislate under the guise of interpretation” and “the failure of the Legislature to include a substantive, significant prescription in a statute is a strong indication that its exclusion was intended”]; Matter of Alonzo M. v New York City Dept. of Probation, 72 NY2d 662, 665-666 [“Where a statute describes the particular situations in which it is to apply and no qualifying exception is added, [1] “an irrefutable inference must be drawn that what is omitted or not included was intended to be omitted or excluded””’]; see also, Matter of Raritan Dev. Corp. v Silva, 91 NY2d 98, 103, n 1 [Majority there rejecting that Dissent’s thesis in support of a New York City agency’s attempt to engraft the agency version of a definitional exclusion onto unqualified statutory language]).
m.
In addition to the plain language direction as to how to discern the meaning of this statute, the legislative history of Penal Law § 10.00 (13), when courts must turn to that analytical step, offers useful instruction. The history does not support *409 the Majority’s departure from the case-by-case application of the pertinent statutes as to whether particular human body parts used by particular defendants may be prosecuted at all. The Majority mistakenly stresses that the Penal Law Revision Commission, in working on the recodification of the Penal Law in the 1960’s, noted that the proposed “dangerous instrument” provision was meant to “includ[e] assaults committed with knives, crowbars, etc., as well as those committed with firearms, blackjacks, metal knuckles, etc.” (majority opn, at 401).
Using that list, the Majority writes in an unrestricted, new and constrictive boundary of its own making, and reaches a conclusion that “the specific reference to obviously dangerous objects such as ‘knives’ and ‘crowbars’ suggests” that an expansive reading of the definition to include parts of the human body was not intended (majority opn, at 401). This turns the analytical process inside out. The judicial interpretive inquiry that should be dispositive here is whether the Legislature used plain language to reflect its intent on the question of excluding all body parts from the words “any instrument.”. The Legislature did not do so, or even so indicate. That should bind the courts to the standard interpretive method and canons of construction.
In any event, the secondary source materials relied on by the Majority plainly reflect an illustrative list, not an exhaustive or exclusive one. Indeed, that limited list of “obviously dangerous” objects, up to now, has supported this Court’s meticulous, common-law approach to determining such issues on a case-by-case, fact-intensive basis. Thus, other innately innocent or innocuous items súch as paper towels, a sidewalk, rubber boots and even a handkerchief have consistently over many years been found to meet the definition of a “dangerous instrument”, when used in a manner which rendered them capable of causing serious physical injury (see, People v Adkinson, sub nom. People v Vasquez, 88 NY2d 561; People v Galvin, 65 NY2d 761; People v Carter, 53 NY2d 113, supra [cited both by the Majority and Dissent at the Appellate Division in the instant case (248 AD2d 491, supra) and a most cogent recent declaration of this Court supporting the view I advance]; People v Cwikla, 46 NY2d 434). The Majority’s restrictive interpretation breaks away from this discipline and cannot be reasonably squared with this Court’s flexible and progressive precedents on this very subject.
*410 Even more significantly, the available legislative history cuts further against the Majority’s reformation of the statute that naturally reflects the only words of the Legislature’s enactment. The Fourth Interim Report of the State Commission on Revision of the Penal Law and Criminal Code discusses the differences in the “old” and “new” definitions of “dangerous instrument” (1965 NY Legis Doc No. 25, at 12). The Commission noted that the “old definition” of “dangerous instrument” was “in terms of an instrument or substance ‘readily capable of being used to produce death or serious physical injury”’ (id.). The Commission characterized that definition as “encompassing] virtually every tangible item on earth” (id. [emphasis added]). The “new definition is in terms of an instrument having such a potential ‘under the circumstances in which it is used, attempted to be used or threatened to be used’ ” (id.).
Instructively, the legislative recodification of the mid-60s did not retreat from the unrestricted meaning and usage of “an instrument.” Rather, it pinpointed that the dangerousness of the instrument must be assessed based on its actual use, not on its innate or even usual capacity for use. That policy goal is better served and fulfilled by realistically-applied jurisprudence, not logical abstractions.
Thus, the legislative history complements the prevailing plain-words approach, and further indicates that the scope of the definition of “dangerous instrument” is limited only by the use to which those statutory words — “any instrument” — are put. It should not be cut off by a post-enactment afterthought and does not hinge on the ordinarily innocent, inherent characteristics of an instrument at issue in a given case. Since the human body and its parts are indisputably “tangible,” and “on earth,” the legislative history of section 10.00 (13) refutes the categorical severance from the statute that today’s holding effectuates.
IV.
I turn next to People v Vollmer (299 NY 347, supra). The Majority relies on an excerpted sentence from the case: “When the Legislature talks of a ‘dangerous weapon’, it means something quite different from the bare fist of an ordinary man” (id., at 350 [emphasis added]). Yet, the holding of that case itself falls far short of the sweep of this case flying on the wing of that one. Instead of espousing an escalation to an absolute bar against parts of the human body ever being considered as dangerous instruments, Vollmer precisely confines the reach of *411 its holding to “an ordinary” person’s use. If the Vollmer Court had intended to exclude the fists of any person, it would not have included the telling adjective. Tacking on the “ordinary” qualifier plainly denotes that the Court considered it possible that the fist of an extraordinary person — such as a boxer, a martial arts expert or even a comparatively large or strong person — could constitute a “dangerous instrument,” under the statute and in case-by-case interstitial developmental circumstances. Thus, neither the Legislature’s words (“any instrument”) nor this Court’s words (“ordinary” person) support the crimp now squeezed onto the operation of the pertinent statute by this transmutive holding.
Additionally, Vollmer is particularly limited to bare fists. While it may take special skill or disproportionate size or strength to render a fist a dangerous instrument under the circumstances in which it is used, “ordinary” folks are capable of using natural teeth to inflict serious injury, even upon larger or stronger victims. Mike Tyson’s fists, we may all agree, were not intended to be covered by Vollmer-, Evander Holyfield might then legitimately wonder about the implied extrapolation from this case holding that Tyson’s (or anyone else’s) “choppers” could never be deemed or used as an “instrument” of dangerous propensities or properties.
Since Vollmer leaves open the possibility that the bare fists of an extraordinary person might constitute a “dangerous instrument,” it sensibly follows — though rejected by the Majority as a matter of law — that teeth, naturally (as in the instant case) or artificially enhanced or replaced, could also be used in a manner that might constitute a “dangerous instrument,” as a matter of fact and proper proof. Yet, the Majority’s projection of Vollmer now takes hands and teeth, and every other human part, out of the realm of realistically possible prosecutions, as a matter of law.
V.
Other courts have probed whether teeth can constitute a dangerous instrument under respective and different statutory formulations. Some refuse to draw an artificial line, viewing the categorical approach as an “exercise in empty formalism” (United States v Sturgis, 48 F3d 784, 788, cert denied 516 US 833 [4th Cir]; United States v Moore, 846 F2d 1163 [8th Cir]). The Fourth Circuit aptly reasoned:
“The test of whether a particular object was used as a dangerous weapon is not so mechanical that it can be readily *412 reduced to a question of law. Rather, it must be left to the jury to determine whether, under the circumstances of each case, the defendant used some instrumentality, object, or (in some instances) a part of his body to cause death or serious injury. This test clearly invites a functional inquiry into the use of the instrument rather than a metaphysical reflection on its nature” (United States v Sturgis, supra, at 788).
The “metaphysical” interpretive exercise flexed to reach the broad holding in the instant case may also inevitably conjure up absurd results. Can the Legislature really be deemed to have meant that if someone bites with dentures or a dental plate then that person can be found to have used a “dangerous instrument,” but if powerful natural teeth are used there are no legally cognizable circumstances under which the teeth of that aggressor can be considered a “dangerous instrument” for appropriate criminal responsibility? The artificial, prosthetic or enhanced fact patterns spinning off this theme are limited only by one’s imagination, and can be either farcical or monstrous. The potential variations, however, underscore the uneven consequences that this newly launched exclusion — only now for the first time judicially engrafted upon Penal Law § 10.00 (13) — can generate. Why a different analysis and result should apply when the assault is accomplished by means of biting to bone with natural teeth in a given case, producing serious permanent injuries as the Appellate Division Majority below emphasized, is not satisfactorily answered for me.
In sum, the strain of the Majority’s formalistic logic falls over backwards from the extreme conclusion that body parts can never be “dangerous instruments.” If ever Justice Oliver Wendell Holmes’ aphorism applied — “[t]he life of the law has not been logic, it has been experience” — this case proves his lesson (Holmes, The Common Law, at 1 [1881]).
VI.
The Majority also claims that Penal Law § 120.00 (1) will be effectively repealed and the gradations of the Penal Law will be blurred if body parts are even allowed to be considered dangerous instruments in given cases. No persuasive explanation is evident for this broad assertion, nor why it should be deemed so compelling or even necessary in this case. Surely a jury would be within its powers to determine that an openhanded slap, a kick, a shove or even a whack with a rolling pin or other inanimate object constituted third degree assault under subdivision (1), without rising to the level of an assault *413 with a dangerous instrument — even assuming a prosecutor did not screen out the presentment of such charges in the first place as a matter of ordinary prosecutorial discretion. Yet, no jury will ever get to pass on the issue in this case, nor any in all the cases that will be hereafter governed by its per se sweep.
Moreover, subdivisions (1) and (2) of the second degree assault statute would overlap no more than they already do under this Court’s extant, governing precedents (see, e.g., People v Cwikla, 46 NY2d 434, supra; People v Adkinson, sub nom. People v Vasquez, 88 NY2d 561, supra). Additionally, the Majority’s reliance on the recent addition of a new subdivision (8) to Penal Law § 120.05 sidesteps the context of the amendment — it is but a small part of a comprehensive bill addressing all kinds of sexual assault crimes against children. The amendment is, thus, essentially irrelevant to the more sharply focused issue presented by this case.
These unpersuasive collateral braces aside, the reasoning that leads the Majority to its matter-of-law blanket prohibition seems also to be built upon the skeptical assumption that no jury would be capable of distinguishing between a body part used in an ordinary fashion, even if it inflicts harm, and one used in a criminal manner so as to constitute a “dangerous instrument” that produces serious bodily harm. Surely, if a jury is capable of determining whether a handkerchief as used under certain circumstances constitutes a “dangerous instrument,” it should be able to make the refined distinction with respect to a body part. As the Sturgis court pointed out, a jury might reject the notion that an open-handed slap constituted use of a dangerous instrument under the circumstances, while at the same time accepting that the use of fingernails to claw out someone’s eyes did constitute use of a dangerous instrument (United States v Sturgis, supra, at 788). These human experiences and variations overwhelmingly prove that these cases are fact-intensive, and should not be subjected to an abstracted matter-of-law regime.
VII
Having tried to present my own thesis and analysis, and to address the Majority’s multi-pronged rationale for overriding the plain language of Penal Law § 10,00 (13), I return to where all courts are obligated to start: the legislatively-decreed utterance of the definition of “dangerous instrument.” It is “any instrument, article or substance * * * which, under the circumstances in which it is used, attempted to be used or threatened *414 to be used, is readily capable of causing death or other serious physical injury” (emphasis added). These legislative words are supple and elastic, not constrictive and rigid. If natural teeth can never be “any instrument, article or substance,” the Legislature should remove them from the sensible operation of the statute — and surely knows how to do that (contrast, Karlin v IVF Am., 93 NY2d 282, 290, n; Matter of Alonzo M. v New York City Dept. of Probation, 72 NY2d 662, supra).
Judicial work is an art, not a science. The craft traces, delves and shapes words — the Legislature’s and the Judiciary’s. Unless or until the Legislature exercises its prerogative[2] of performing major surgery on a statute, “ ‘the court should construe [the statute] so as to give effect to the plain meaning of the words used’ ” (Matter of Raritan Dev. Corp. v Silva, 91 NY2d 98, 107, supra, quoting Patrolmen’s Benevolent Assn. v City of New York, 41 NY2d 205, 208 [emphasis omitted]).
In sum, I have searched the statute itself in vain for words, or even import, of substantial and categorical limitation. Likewise, I have searched the Majority’s reversal rationale. I come up equally empty as to why the Court today chooses to retreat from its well-settled statutory interpretation methodology and precedents to decide this kind of case in this way (see, Matter of Raritan Dev. Corp. v Silva, supra, at 104-108; People v Finnegan, 85 NY2d 53, supra; Matter of Jose R., 83 NY2d 388, 393-394; Matter of Alonzo M. v New York City Dept. of Probation, 72 NY2d 662, supra; Doctors Council v New York City Employees’ Retirement Sys., 71 NY2d 669, 674-675). There is a compelling necessity to express this dissenting view, especially in this statutory construction case because a blanket bar is being created. Moreover, the Legislature is entitled to have the Majority’s declaration brought to its more pointed attention for amendatory consideration, if that Branch of lawmaking government so desires. The standard mechanism for accomplishing this is the casting of my dissenting vote, through *415 this Opinion that the Majority misconstrues the Legislature’s original intent and misaligns the array of authorities that support an affirmance of a correct and nimble Appellate Division Majority decision (248 AD2d 491, supra).
Chief Judge Kaye and Judges Smith, Levine and Ciparick concur with Judge Wesley; Judge Bellacosa dissents and votes to affirm in a separate opinion; Judge Rosenblatt taking no part.
Order reversed, etc.

. Cardozo, The Nature of the Judicial Process: “This does not mean that there are not gaps, yet unfilled, within which judgment moves untrammeled. Mr. Justice Holmes has summed it up in one of his flashing epigrams: 7 recognize without hesitation that judges must and do legislate, but they do so only interstitially; they are confined from molar to molecular motions’ ” (Selected Writings [Hall ed], at 134).

. With a delicious wordplay particularly apt for this case, the Great Bard provides a masterful conversation among a well known rebel band on how law can be made. In the Second Part of Henry VI, Act 4, Scene 7, lines 7-19, the following ensues:
“Dick [The Butcher]. Only that the laws of England may come out of your mouth. * * *
“[Jack] Cade. I have thought upon it; it shall be so. Away! bum all the records of the realm: my mouth shall be the parliament of England.
“Hollfand]. (Aside.) Then we are like to have biting statutes, unless his [Jack Cade’s] teeth be pulled out.” (The Yale Shakespeare [emphasis added].)