# State of New York
# Court of Appeals

OPINION

This opinion is uncorrected and subject to revision
before publication in the New York Reports.

No. 46
The People &c.,
   Respondent,
  v.
Dashawn Deverow,
   Appellant.

Alice R.B. Cullina, for appellant.
Nancy Fitzpatrick Talcott, for respondent.

SINGAS, J.:

Defendant Deshawn Deverow was convicted of murder in the second degree and

criminal possession of a weapon in the second degree in the shooting death of seventeen-

year-old Xavier Granville. At trial, the court precluded certain evidence offered by

- 1 -

defendant in support of his justification defense.  Under the facts presented and upon application of our well-settled law, the effect of the trial judge's erroneous evidentiary rulings deprived defendant of his constitutional right to present a defense.  Accordingly, we reverse and order a new trial.

I.

On December 29, 2012, around 12:30 a.m., a group of about 20 people, including members of the "40 Boys" gang, were gathered outside of 249 Beach 15th Street in Queens.  Granville joined the group, having just attended a party inside the building.  According to eyewitness R.M., defendant and a codefendant, Jamane Yarbrough, were standing across the street, drew weapons, and fired at the crowd.  One bullet fired by Yarbrough from a .45 caliber semiautomatic pistol struck Granville in the head, killing him.  According to witnesses, a few seconds later, another volley of shots rang out further up the block.

R.M. ran from the scene when defendant and Yarbrough drew their weapons.  As he fled, he fell and was injured, requiring stitches at the hospital.  Because he reported a possible gunshot wound, police responded, and he told detectives of the shooting, implicating defendant and Yarbrough.  Later that evening, R.M. identified both men in lineups.  Defendant and Yarbrough were arrested at approximately 10:30 p.m. on December 29, less than 24 hours after the shooting.  Defendant initially denied being on the scene, but after interrogation, provided a written statement indicating that he had been on Beach 15th Street around 12:30 a.m. on December 29.  He further stated that once on the block, he recognized members of the 40 Boys, who began shooting at him and

Yarbrough. Defendant got scared, drew his gun and fired back at them. He was indicted and charged with second-degree murder and second-degree criminal possession of a weapon.

R.M. was the sole eyewitness to testify at trial. He testified that on December 28, after he received a call from R.J., his girlfriend of several months, he took the A train to meet her at Beach 44th Street. They traveled together to Mott Avenue, where they exited the train together at about 11:30 p.m. and walked around for approximately 20 minutes. Then, they walked together for about six blocks towards R.J.'s home. When they were "close by[ ] 249" Beach 15th Street, R.M. noticed a party going on across the street. He told R.J. he had to go home, gave her a hug, and began to walk away. He did not look back or see where R.J. went after they parted. "Seconds" later, R.M. saw defendant and Yarbrough. He recognized both men from seeing them around the neighborhood. A car skidded to a stop on the street, and R.M. saw defendant and Yarbrough both draw guns. R.M. began to run away and heard two shots ring out behind him. He fell to the ground, injuring himself. He turned around and saw defendant and Yarbrough pointing their guns toward the group of people in front of 249 Beach 15th Street. He saw the guns flash and smoke. He heard approximately 13 shots in total but did not see anyone in the group across the street fire at defendant and Yarbrough.

Three people, one identified and two anonymous, called 911 to report what they had seen and heard that evening. One of these calls came from B.M., who lived in the apartment building at 249 Beach 15th Street. At 12:30 a.m., B.M. called 911 to report that a man "just got shot in the head in front of [her] building." She stated that from her

bedroom window she could see the victim lying on the sidewalk. B.M. told the operator that the shooters left the scene in a beige Jeep Wrangler. B.M. repeated this description of the car several times. She said there were probably four people in the car. During the call, B.M. said, "They're still shooting, ma'am," and the operator responded, "Okay, I hear it."

An anonymous caller, identified as Caller 7, stated that "somebody just got shot" outside 249 Beach 15th Street. Caller 7 had not seen the shooting, but heard about fifteen shots and reported that the shooter "ran off in a car." Caller 7 said the male victim was "laying down on the sidewalk," but was not able to tell the operator the victim's age or whether the victim was breathing. Caller 7 made the call to try to "save somebody's life."

A second anonymous caller, Caller 21, reported a shooter who was "still around." Caller 21 stated that there had been two volleys of shots, about eight the first time and five the second time, fired from an "assault rifle" by a black man wearing white pants, a white jacket, and a white cap. The caller said that the shooter left the street on foot, walking "behind the building" at 289 Beach 15th Street. Caller 21 only saw one shooter, but told the operator there could have been more than one, as the shooter spoke to another man at one point. Caller 21 repeatedly urged the police to hurry to the scene and to be careful.

Police and EMS arrived at around 12:36 a.m. and found a crowd of 20 to 30 people surrounding the victim. Police recovered nine .45 caliber shells across the street from 249 Beach 15th Street, in the area where R.M claimed he saw defendant and Yarbrough open fire. They also recovered 14 assault rifle shells and live cartridges about 250 feet further up the block, on the east sidewalk near 288 Beach 15th Street. There were no shells or ammunition found near the victim's body.

At trial, the People maintained that defendant and Yarbrough initiated the shooting and that no one in the group they shot at was armed. Defendant countered with a justification defense, claiming that the 40 Boys fired first and that he and Yarbrough only returned fire in self-defense.

The People called a security guard, J.C., who was on duty in the lobby of 249 Beach 15th Street on the evening of the shooting. He testified that around 12:30 a.m., he heard shots fired out on the street. J.C. went outside, and saw the victim lying on the sidewalk. He called 911. A few minutes later, he heard two "rapid fire" rounds of shots further up the block.

The People also called B.M., one of the 911 callers. She testified that, at around 12:30 a.m. on December 29, 2012, she had just returned home to 249 Beach 15th Street from work. She looked out her apartment window to the street below and heard gunshots. Contrary to her statements to the 911 operator, B.M. testified that she had not been able to tell who the shooters were or how they left the scene. B.M. stated that she "assumed" the shots came from the car because it was driving off while she made the call. She also stated that, due to the gunshots, she had moved "away from the window" while calling.

During cross-examination, defendant sought to introduce B.M.'s 911 call for impeachment purposes. The People opposed, arguing that the prior inconsistent statement on the 911 tape was not necessary to impeach B.M., as she had already admitted that her trial testimony conflicted with statements made during her 911 call. The court agreed, stating that B.M. had "not denied the fact she called 911 and said these things on the tape," and ruled that the call could not be played.

Defendant, during his case, attempted to call R.J., R.M.'s girlfriend, as a witness to contradict R.M.'s testimony. According to defendant, R.J. would have testified that she was not with R.M. at any point on the night of the shooting, and that she lived a mile away from 249 Beach 15th Street. The court precluded this testimony on the ground that it would serve only to impeach R.M. on a collateral issue.

Defendant also sought to introduce B.M.'s 911 call and the two anonymous 911 calls as present sense impressions or excited utterances, for the truth of the matter asserted in the calls. The court denied this application, ruling that none of the calls were admissible because there was insufficient evidence corroborating the statements made by the callers.

The court charged the jury on defendant's justification defense, but the jury rejected it and convicted him of second-degree murder and second-degree criminal possession of a weapon.

The Appellate Division reduced defendant's sentence, as a matter of discretion in the interest of justice, but otherwise affirmed the judgment (180 AD3d 1064 [2d Dept 2020]). A Judge of this Court granted defendant leave to appeal (35 NY3d 1044 [2020]). We now hold that the trial court's evidentiary rulings regarding R.J.'s testimony and the 911 calls deprived defendant of his constitutional right to present a defense.

II.

Criminal defendants must be afforded "a meaningful opportunity to present a complete defense" (*Crane v Kentucky*, 476 US 683, 690 [1986] [internal quotation marks omitted]). This fundamental right is guaranteed by the Due Process Clause of the Fourteenth Amendment and the Compulsory Process and Confrontation Clauses of the

Sixth Amendment (*see id.*). Although this "right to present a defense does not give criminal defendants carte blanche to circumvent the rules of evidence" (*People v Hayes*, 17 NY3d 46 [2011] [internal quotation marks omitted]), a trial court must not apply the rules "mechanistically to defeat the ends of justice" (*Chambers v Mississippi*, 410 US 284, 302 [1973]). Thus, "[a] court's discretion in evidentiary rulings is circumscribed by" the defendant's constitutional right to present a defense (*People v Carroll*, 95 NY2d 375, 385 [2000]).

Here, the court erred in excluding R.J.'s testimony. A "party may not introduce extrinsic evidence on a collateral matter solely to impeach credibility" (*People v Alvino*, 71 NY2d 233, 247 [1987]). The purpose of this rule is "to avoid undue confusion and unfair surprise on matters of minimal probative worth" (*People v Knight*, 80 NY2d 845, 847 [1992], citing *People v Pavao*, 59 NY2d 282, 289 [1983]). However, where evidence is "clearly probative of [a] witness's ability to accurately recall or to observe the details of" the relevant event, it is not collateral and it is admissible (*People v Jenkins*, 68 NY2d 896, 898 [1986]).

R.J.'s proffered testimony was probative of R.M.'s ability to observe and recall details of the shooting. At trial, R.M. testified that he was with R.J. until "seconds" before he witnessed the shooting, and that he was at the scene to walk R.J. home. Upon the People's questioning, R.M. explained in detail his relationship with R.J., resulting in many pages of testimony as to where he met up with her that evening, the amount of time they spent together, and when they parted ways. This testimony, introduced and relied upon by the People, made R.J. an integral part of R.M.'s account of why he was in a position to

witness the shooting, and placed her with him mere seconds before it occurred. Since the People's own theory of the case placed R.J. on the scene the instant before the shooting, her testimony cannot be characterized as collateral.

If R.J. had testified as defendant indicated she would, her testimony would have directly contradicted a significant portion of R.M.'s account, and undermined R.M.'s testimony regarding how and where he encountered defendant and Yarbrough on Beach 15th Street, immediately before they fired their weapons. Given that R.M. was the sole eyewitness to testify at trial, and the only person claiming that defendant and Yarbrough fired first, R.J.'s account was not collateral to factual issues to be decided by the jury.[1]

The court also erred in excluding the three 911 calls. The calls were admissible as present sense impressions. The present sense impression exception to the hearsay rule applies to statements that are "(1) made by a person perceiving the event as it is unfolding or immediately afterward" and "(2) corroborated by independent evidence establishing the reliability of the contents of the statement" (*People v Cantave*, 21 NY3d 374, 382 [2013]). "[D]escriptions of events made by a person who is perceiving the event as it is unfolding" are "deemed reliable . . . because the contemporaneity of the communication minimizes the opportunity for calculated misstatement as well as the risk of inaccuracy from faulty memory" (*People v Vasquez*, 88 NY2d 561, 574 [1996]).

---

[1] Allowing this evidence to be admitted under these facts is consistent with our rule permitting the admission of extrinsic evidence for other relevant purposes (*see e.g. Knight*, 80 NY2d at 847 n, citing *People v Dawson*, 50 NY2d 311, 321 [1980] [holding that extrinsic evidence is admissible to the extent that it bears on the truth of an alibi, and admitting testimony of an officer to contradict alibi witnesses' statements that they came forward at the time of defendant's arrest]).

A present sense impression is contemporaneous as long as there is no more than "a marginal time lag between the event and the declarant's description of that event"; this ensures that there is minimal "time for reflection" by the declarant (*id.* at 575). The standard for corroboration of a present sense impression is more complex. "[S]ome additional indicia of reliability" must be present (*People v Brown*, 80 NY2d 729, 736 [1993]). In other words, the proponent of the statement must demonstrate "some independent verification of the declarant's descriptions of the unfolding events" (*Vasquez*, 88 NY2d at 575). However, corroboration by "an equally percipient witness" is not required for the statement to be deemed admissible (*Brown*, 80 NY2d at 735-737 [internal quotation marks omitted]), and the declarant may be "an unidentified bystander" (*id.*). There is no "definitive template for general application" of this standard (*Vasquez*, 88 NY2d at 576). The "critical inquiry" is "whether the corroboration offered to support admission of the statement truly serves to support its substance and content" (*id.*). "What corroboration is sufficient will depend on the particular circumstances of each case" (*Brown*, 80 NY2d at 747).

Each 911 call here satisfied the contemporaneity requirement, undisputedly describing the events as they were unfolding. The calls came from the scene of the crime, at the time of the crime. During B.M.'s call, gunshots were still being fired, as acknowledged by the 911 operator. Caller 7 stated that "somebody just got shot" and was "trying to save someone's life" by making the call, demonstrating the caller's belief that there was a need for urgent medical attention. Caller 21 spoke in hushed tones because the

person the caller perceived as the gunman had just left the scene on foot, and urged the officers to be careful, evincing a belief that the danger had not passed.

Each of the calls was also sufficiently corroborated by independent evidence establishing the reliability of the contents of the statements therein. The statements of B.M. and Caller 7, that a man had been shot outside of 249 Beach 15th Street, were corroborated by the discovery of the victim's body on the sidewalk at that location. B.M.'s call specifically stated that the victim had been shot in the head; the victim's cause of death was a bullet wound to the head. Caller 7's report that there were about 15 shots was corroborated by R.M.'s testimony at trial that there were 13 shots in the first round of shooting. Caller 21's statement that there were two rounds of shots, totaling about 13, fired by a man with an assault rifle in front of 289 Beach 15th Street, was corroborated by the 14 assault rifle shells recovered outside 288 Beach 15th Street that the People introduced into evidence, as well as the security guard J.C.'s trial testimony that he heard two rounds of "rapid fire" shots after the shots that killed the victim. Caller 7 and B.M. both reported that the shooter or shooters left the scene in a car. B.M. described the car as a beige Jeep Wrangler, which to some extent corresponds with R.M.'s testimony that a white car screeched to a halt on the block immediately before shots were fired.

That certain details of the 911 calls conflict with the People's evidence and their theory of the case does not render the statements in the calls unreliable. Indeed, that potential conflict supports defendant's argument that the precluded testimony, the "substance and content" (*Vasquez*, 88 NY2d at 576) of which was consistent with other record evidence, denied him his right to present a defense.

The fact that B.M., in her testimony, conceded inconsistencies in her 911 call was relevant only to the admission of the call for impeachment purposes (*People v Piazza*, 48 NY2d 151, 164-165 [1979] ["(T)hough (extrinsic evidence) will be received when it tends to establish inconsistency," it is within the trial judge's discretion to exclude it if "(t)he contents . . . f(ind) their way into the record"]). Regardless of whether the call was admissible to impeach B.M., it should have been admitted for the truth of the matter asserted as a present sense impression. B.M.'s "availability at trial d[id] not preclude the admissibility of [a 911] tape under that hearsay exception" (*People v Buie*, 86 NY2d 501, 503 [1995]). Because the three calls were contemporaneous with the events in question, and were independently corroborated, the trial court abused its discretion when it excluded them.

III.

"The right of an accused in a criminal trial to due process is, in essence, the right to a fair opportunity to defend against the State's accusations" (*Chambers*, 410 US at 294). The trial judge's evidentiary rulings here deprived defendant of "a meaningful opportunity to present a complete defense" (*Crane*, 476 US at 690 [internal quotation marks omitted]) and were not harmless. The evidence presented against defendant's justification defense was far from overwhelming. The precluded testimony of R.J. could have contradicted the sole eyewitness at trial who negated the justification defense and impacted the jury's analysis of that witness's ability to perceive and recall the events. Moreover, there was a reasonable possibility that the error contributed to defendant's conviction (*see People v Crimmins*, 36 NY2d 230, 240-241 [1975]). Admitting the 911 calls could have allowed

defendant the opportunity to buttress his justification defense, to mount a different defense, or to challenge the eyewitness's account of events.  Precluding this testimony effectively tied defendant's hands.  A jury should have been allowed to hear and assess the excluded information and reach a verdict after weighing all the relevant evidence.

Our holding renders defendant's remaining contentions academic.

Accordingly, the order of the Appellate Division should be reversed and a new trial ordered.

Order reversed and a new trial ordered. Opinion by Judge Singas. Chief Judge DiFiore and Judges Rivera, Garcia, Wilson, Cannataro and Troutman concur.

Decided May 24, 2022