[12 NE3d 444, 989 NYS2d 446]

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v EN-
RIQUE RIVERA, Appellant.

Argued February 18, 2014; decided April 8, 2014

## POINTS OF COUNSEL

*Lynn W.L. Fahey, Appellate Advocates*, New York City (*Leila Hull* of counsel), for appellant. The court violated appellant's due process right to a fair trial when it refused to charge to the jury second-degree manslaughter as a lesser included offense of second-degree murder, although there was a reasonable view of the evidence that appellant, who had been drinking, recklessly killed the deceased during a barroom brawl. (*People v Perry*, 19 NY3d 70; *People v Glover*, 57 NY2d 61; *People v Green*, 56 NY2d 427; *People v Sullivan*, 68 NY2d 495; *People v Van Norstrand*, 85 NY2d 131; *People v Martin*, 59 NY2d 704; *People v Henderson*, 41 NY2d 233; *People v Scarborough*, 49 NY2d 364; *People v Negron*, 91 NY2d 788; *People v Asan*, 22 NY2d 526.)

*Charles J. Hynes, District Attorney*, Brooklyn (*Solomon Neubort, Leonard Joblove* and *Seth M. Lieberman* of counsel), for respondent. None of defendant's arguments in support of his claim that he was entitled to the submission of the lesser included offense of second-degree manslaughter is preserved for appellate review. Moreover, defendant's claim is meritless. In any event, any error in the court's refusal to submit the lesser offense was harmless. (*People v Monroe*, 90 NY2d 982; *People v Gray*, 86 NY2d 10; *People v Robinson*, 36 NY2d 224; *People v Lynn*, 27 AD3d 381; *People v Barney*, 99 NY2d 367; *People v Van Norstrand*, 85 NY2d 131; *People v Green*, 56 NY2d 427; *People v Martin*, 59 NY2d 704; *People v Discala*, 45 NY2d 38; *People v Scarborough*, 49 NY2d 364.)

READ, J.

Defendant Enrique Rivera was charged with second-degree murder (Penal Law § 125.25 [1]) and criminal possession of a weapon in the fourth degree (Penal Law § 265.01 [2]) in connection with the stabbing death of Edgar Ojeda at a Brooklyn bar in the early morning hours of February 27, 2005. The narrative of what happened and its aftermath, as developed at defendant's jury trial in May 2009,[1] follows. The issue in this appeal is whether the trial judge should have submitted a charge of second-degree manslaughter to the jury.

## I.

Enrique Navarette, who had in the past occasionally worked at the Brooklyn bar as a bouncer, arrived there between 11:30 and 11:45 p.m. on February 26, 2005. While sitting in the front corner of the bar, near the entrance, he saw defendant and three male companions walk in. Defendant was wearing a camouflage jacket with a hoodie; one of the four men was wearing a green cap, but Navarette could not recall which one. After the bouncer patted them down for weapons, the defendant and his companions stopped by the bar for beers and then continued to the back of the room towards the dance floor.

Between 1:00 and 1:30 a.m., Ojeda, along with Carlos Solomon, Jonathan Dominguez and another friend, arrived at the Brooklyn bar, having left a nearby strip club where they had been since about 11:30 p.m. Shortly after arriving, Solomon walked to the back of the bar to the men's room. He had been standing with Ojeda in front of a side exit door near a jukebox, not far from the dance floor. On his way to the men's room, Solomon saw defendant dancing with a woman on the dance floor.

After rejoining Ojeda, Solomon witnessed defendant approach Ojeda and whisper something in his ear. He could not hear what was being said, "[b]ut there was [a] conversation going on." Defendant was joined by two of his friends. Solomon asked one of these men, "Is there a problem?" and the two began to quarrel. Then "all of a sudden" Solomon saw defendant "strike" or "punch" Ojeda twice in Ojeda's left shoulder or chest. Likewise,

---

1. This was defendant's second trial; the first ended in a mistrial as a result of a hung jury (see Matter of Rivera v Firetog, 11 NY3d 501 [2008] [dismissing defendant's CPLR article 78 petition to preclude a retrial for murder on double jeopardy grounds]). During the first trial, Supreme Court dismissed the weapon possession charge.

Navarette saw defendant abruptly "push" Ojeda with one hand "twice, maybe" on the upper left side of Ojeda's chest near his shoulder. Neither Solomon nor Navarette noticed whether anything was in defendant's hand.

The bouncer rushed in to break up the fighting, and Navarette followed to back him up. Defendant and one of his companions quickly left the Brooklyn bar, chased by the bouncer, and Navarette stayed behind to stop anyone from following. Navarette separated Solomon and Dominguez from defendant's remaining companion, who turned out to be defendant's brother, Julio Rivera, but they both managed to throw punches at Julio before he, too, left the bar.

Dominguez had been standing with his back to Ojeda and Solomon, talking to someone, before he became aware of the "scuffle" behind him and turned around. When Dominguez asked Ojeda and Solomon what was happening, Ojeda replied "I'm stabbed." Dominguez saw blood "leaking down" from Ojeda's neck. Ojeda, although choking and bleeding heavily, was able to make it on his own to Solomon's car, parked near the Brooklyn bar. Solomon drove Ojeda, along with Dominguez and their other friend, to Lutheran Medical Center, about 20 blocks distant, running red lights along the way. The trip took minutes, but Ojeda lost consciousness before reaching the hospital, where medical personnel were unable to revive him. Ojeda was apparently the only individual to suffer knife wounds during this incident.

Later on February 27, 2005, Dr. Frede Frederic, a forensic pathologist who works as a medical examiner in New York City's Office of Chief Medical Examiner, autopsied Ojeda. Frederic, who had by that point in her career performed more than 5,000 autopsies, determined that Ojeda suffered three stab wounds. One stab wound was in the upper left chest and was about five inches deep and 1¼ inches long. This wound pierced the upper lobe of the left lung and "cut through" the second rib, causing Ojeda to bleed to death. The second stab wound was to the left upper back. It was 2¼ inches deep and about 1¼ inches long. The third wound, also in the back of the left shoulder, was two inches deep and about 1¼ inches long. These last two nonlethal stab wounds injured the skin, subcutaneous tissue and muscle of the left shoulder.

All three wounds went from left to right and downward at an acute angle, and were consistent with having been inflicted with

the same knife or sharp instrument, which was either sharp on both sides or had a very thin edge on the unsharpened side. Dr. Frederic opined at trial that Ojeda's wounds could not have been caused by someone "waving" a knife around because "you have to stab the person. The knife has to go through." According to Dr. Frederic, the fatal stab wound would have caused Ojeda to bleed profusely, lose consciousness in a few minutes, after the loss of enough blood, and then die a few minutes later.

On February 28, 2005, two detectives went to an apartment believed to be defendant's residence to search for him. There they met defendant's brother Julio, who had been with defendant at the Brooklyn bar, and returned to the precinct with him. Later that morning, at about 1:20 a.m., detectives returned to this apartment. They knocked on the door and were let in by defendant's mother. One of the detectives noticed a green camouflage jacket, brown hoodie sweatshirt and green army cap lying on the bedroom floor; bloodstains on the cap were subsequently matched to Ojeda's DNA. Defendant acknowledged having worn this green cap to the bar on February 27th.

A few hours later, Detective John Darino, the detective assigned to the Ojeda case, learned from defendant's brother Julio that defendant was at a house in Queens, where the police found him at 4:20 a.m. Detective Darino informed defendant that he was investigating an incident at a Brooklyn bar, and handcuffed and transported him to the precinct, where he was taken to the detective squad interview room. Detective Darino read defendant his *Miranda* rights, and defendant agreed to speak with the police.[2] Detective Darino told defendant that people had placed him in the Brooklyn bar, and he wanted defendant's version of what happened.

Defendant relayed that when he went up to the bar to buy a round of drinks, he got "looks" from someone who asked him "What's up?" He responded "What's your problem?" Defendant said he then felt "grabbing and punching," and so took out a knife and "started swinging it at the crowd," and "didn't know that he actually hit anybody or hurt anyone." He then left the premises, "jumped in his car" and drove away. Detective Darino asked defendant if he would be willing to write out a statement, and defendant agreed to do so.

In his written statement, which was read to the jury, defendant similarly stated as follows:

---

**2.** Defendant claimed at trial that he was not read his *Miranda* rights until *after* he made oral and written statements.

"While I was [at the Brooklyn bar] having a few drinks I had a small confrontation with a guy. It was just words, but as the night goes on, I'm getting these eyes . . . contacted [sic] but nothing to it. Now, as I go to the bar to get my second round, the guy is still looking at me and I happen to look back at him. So he said 'What's up?' and I asked him what seems to be the problem. And right away the crowd rose. Then I felt punches and grabbing. So I take out a knife, used it in self defense, swinging it at the crowd not knowing that I really hurt anyone. I got out of there, got in my car and went home. I didn't know someone was hurt. It was self defense. I didn't mean it. I was just scared. I know by saying sorry is not going to bring that person back, but I really didn't mean this to go down this way. I'm very sorry."

On February 28th, defendant also gave a videotaped statement to the assistant district attorney, which was shown to the jury. When asked during the videotaped statement to demonstrate how he wielded the knife, defendant, who was sitting, moved his arm weakly at mid-chest level from right to left at a slight downward angle. Additionally, he told the assistant district attorney that he threw the knife away after he left the Brooklyn bar. Later that day, Navarette and Solomon separately identified defendant in a lineup.

At trial, defendant's brother Julio testified that he had gone to the Brooklyn bar with defendant and two other friends, Little Julio and J.P. Julio reported that he had heard men cursing, observed "hand gestures" and "pointing fingers" and that he had gone towards them and "just got in the middle." Julio separated the two groups of men, but when one of them punched him, he hit back, and then "all the punches started going off." J.P. grabbed Julio, "trying to get" him out of the Brooklyn bar. Julio said that he would not leave without defendant, but then he saw that defendant and one of the bouncers were already almost out the door.

Defendant testified on his own behalf. He recounted that after watching a boxing match and drinking beer with his brother Julio at the barbershop that he operated with another brother, he and Julio went to the Brooklyn bar to meet friends. Defendant denied bringing a knife with him. Defendant related that when he received a phone call, he stepped into the men's room

so that he could hear his caller over the loud music. When Ojeda walked in and commented "This ain't no phone booth," defendant hung up and rejoined his friends. Upon leaving the men's room, Ojeda purposely "brushed into" defendant, staring at him "a little aggressive[ly]" as he walked by. Defendant assumed Ojeda was drunk and "[paid] it no mind," but he "let Little Julio know." Defendant finished his drink and went to the bar to buy another round for himself and his friends.

After purchasing the drinks, defendant looked around for one of his friends to help him carry them. Defendant saw Ojeda, who looked his way and "bopped his head like 'What's up?' " At this point, defendant thought "this kid, he['s] really got a problem," so he went over to Ojeda and asked "[W]hat seems to be the problem?" Ojeda replied, " 'I ain't got no problem. You got a problem?[']" Meanwhile, Little Julio joined defendant, who took out a business card for his barbershop, gave it to Ojeda and told him to come visit him sometime. As defendant was trying in this way to defuse the "hostility" projected by Ojeda, Solomon approached and stood "real close." Then defendant's brother Julio arrived. By this time, there was "a little cursing going back and forth." Defendant was trying to get Little Julio to calm down, but then Solomon "took a swing" at defendant and hit him. He reacted by throwing punches, hitting both Ojeda and Solomon. Defendant denied possessing or wielding a knife.

According to defendant, a bouncer then "manhandled" him out the door onto the sidewalk. Finding the door locked behind him, defendant went to his car and turned on the ignition. Little Julio exited the Brooklyn bar and joined defendant, who did not want to leave without his brother Julio. When Little Julio got into the car, defendant noticed "blotches" of blood on the chest or shoulder of his jacket.[3] Defendant asked Little Julio where the blood came from, and Little Julio assured him that he was not bleeding. On cross-examination, defendant conceded that he had never before mentioned the presence of blood on Little Julio's jacket.

Defendant radioed his brother Julio on a walkie-talkie, and his brother eventually radioed back that he and J.P. were on their way to a diner that was a neighborhood meeting place

---

**3.** Defendant also testified, though, that he did not observe the blood until the end of the evening, when he dropped Little Julio off near his residence. Defendant's attorney suggested at trial that Ojeda's blood might have gotten on defendant's green cap by virtue of contact with the bloody splotches that defendant professes to have observed on Little Julio's jacket.

after a night of clubbing. Defendant then drove off with Little Julio and met up with Julio and J.P. Defendant thought "the night was too young," but Julio and J.P. told him they were going home. Defendant made a phone call to a female friend, and dropped off Little Julio near the apartment building where he lived.

Defendant claimed that he confessed, after he was brought to the precinct on February 28th, because Detective Darino threatened that if he did not, both he and his brother Julio would be charged with murder, and Julio would face life imprisonment. According to defendant, Detective Darino told him that the police knew that he was "kicked out" of the Brooklyn bar and Julio was left behind; that his brother was now at the precinct "being charged with murder" because he tried to protect defendant in the fight; and that if defendant "[took] the weight" for (i.e., confessed to) killing Ojeda in self-defense, Julio would be freed and defendant would only face 8 to 10 years in prison. Detective Darino testified that he never made any such threats or representations to defendant.

During the charge conference, defendant requested that Supreme Court submit second-degree manslaughter (Penal Law § 125.15 [1]) and criminally negligent homicide (Penal Law § 125.10) to the jury as lesser included offenses of the murder count. Defense counsel argued that "if you're swinging a knife at a crowd[, i]t's like firing a weapon at a crowd. It's reckless," and therefore not intentional. The trial judge refused this request, noting that the medical examiner had testified that the stab wounds "could not have been inflicted by someone just swinging a knife around. They had to have been stabbed—stabbing wounds caused by intentional infliction. So there is no basis to submit a reckless count on the evidence in this case."

Supreme Court submitted the indicted charge of second-degree murder (Penal Law § 125.25 [1]) and first-degree manslaughter (Penal Law § 125.20 [1]) as a lesser included offense. The judge also charged the jury on intoxication as relevant to intent (Penal Law § 15.25).[4] The jury acquitted defendant of murder and found him guilty of first-degree manslaughter (Penal Law § 125.20 [1]). On June 8, 2009, Supreme Court adjudicated defendant a second violent felony offender and sentenced him to a determinate prison term of 25 years to be followed by five years of postrelease supervision.

---

4. Viewed in the light most favorable to defendant, he consumed five to seven beers over the three-hour period prior to the stabbing.

Defendant appealed, arguing that the court violated his due process right to a fair trial by refusing to submit second-degree manslaughter to the jury because a reasonable view of the evidence supported the conclusion that he killed Ojeda recklessly. On November 7, 2012, the Appellate Division affirmed, holding that there was, in fact, "no reasonable view of the evidence that would support a finding that the defendant acted recklessly when he stabbed the victim" (100 AD3d 658, 660 [2d Dept 2012]). On March 1, 2013, a Judge of this Court granted defendant leave to appeal (20 NY3d 1103 [2013]), and we now affirm.

## II.

A party who seeks to have a lesser included crime charged to the jury must satisfy a two-pronged inquiry. First, the crime must be a lesser included offense within the meaning of Criminal Procedure Law § 1.20 (37).[5] Here, defendant asked the trial judge to charge second-degree manslaughter, which is a lesser included crime of second-degree intentional murder (*see People v Tai*, 39 NY2d 894 [1976] [reckless manslaughter is a lesser included offense of intentional murder]). Second, the party making the request for a charge-down "must then show that there is a reasonable view of the evidence in the particular case that would support a finding that [the defendant] committed the lesser included offense but not the greater" (*People v Glover*, 57 NY2d 61, 63 [1982]; CPL 300.50 [1]).[6] In assessing whether there is a "reasonable view of the evidence," the proof must be

---

5. This provision defines "Lesser included offense" as follows:
   "When it is impossible to commit a particular crime without concomitantly committing, by the same conduct, another offense of lesser grade or degree, the latter is, with respect to the former, a 'lesser included offense.' In any case in which it is legally possible to attempt to commit a crime, an attempt to commit such crime constitutes a lesser included offense with respect thereto" (CPL 1.20 [37]).

6. Subdivision (1) of this provision, which is entitled "Court's charge; submission of lesser included offenses," states, as relevant, that
   "[i]n submitting a count of an indictment to the jury, the court in its discretion may, in addition to submitting the greatest offense which it is required to submit, submit in the alternative any lesser included offense if there is a reasonable view of the evidence which would support a finding that the defendant committed such lesser offense but did not commit the greater. If there is no reasonable view of the evidence which would support such a finding, the court may not submit such lesser offense" (CPL 300.50 [1]).

looked at "in the light most favorable to [the] defendant" (*People v Martin*, 59 NY2d 704, 705 [1983]), which requires awareness of "the jury's right to accept some part of the evidence presented by either side and reject other parts of that proof" (*People v Green*, 56 NY2d 427, 434 [1982]). We have never, however, "countenance[d] selective dissection of the integrated testimony of a single witness as to whom credibility, or incredibility, could only be a constant factor" (*People v Scarborough*, 49 NY2d 364, 373 [1980]; *see also People v Negron*, 91 NY2d 788, 792 [1998]).

A "reasonable view of the evidence" does not mean, as defendant insists, that a trial court must charge reckless manslaughter as a lesser included offense of second-degree murder unless the record "completely excludes the possibility that the defendant acted recklessly." Rather, in *Scarborough* we rejected this notion that "every possible hypothesis but guilt of the higher crime must be excluded to eliminate submission of lesser included crimes" (*Scarborough*, 49 NY2d at 372 [internal quotation marks omitted]); or that "reasonable view" means "any view," with the consequence that "the spectrum of all theoretical lesser included offenses . . . would have to be charged on request in each case within each family of criminal transactions, e.g., controlled substances, larceny, theft, assault, homicide, sex offenses" (*id.* at 373). Instead, we held in *Scarborough* that

> "if, on the whole record, there is not some identifiable, rational basis on which the jury could reject a portion of the prosecution's case which is indispensable to establishment of the higher crime and yet accept so much of the proof as would establish the lesser crime, then the lesser included offense may not be submitted" (*id.* at 369-370).[7]

Without such an identifiable basis, " 'charging the lesser included offense would force the jury "to resort to sheer specula-

---

Subdivision (2) provides that if the court is authorized by subdivision (1) to submit the lesser included offense, it must do so if asked by either party.

**7.** We gave examples in *Scarborough* of cases where there was a rational basis for a jury to reject proof establishing the greater crime only. We added that

> "[o]ther circumstances suggest themselves as possibly presenting a rational ground for a jury's disbelief of some, but not all, of the prosecution's proof. If, as is most often so, the People's case is a composite of several witnesses and perhaps exhibits, some segments of the evidence—and even some portions of a single witness' testimony—may be impugned, cast in doubt or discredited

tion" ' " (*id.* at 371, quoting *People v Discala*, 45 NY2d 38, 43 [1978]; *see also Negron*, 91 NY2d at 792).

Here, the question is whether the trial judge should have charged second-degree manslaughter in addition to first-degree manslaughter. First- and second-degree manslaughter and second-degree murder share the actus reus of causing the death of another person. The crimes differ in mens rea: second-degree intentional murder and first-degree or intentional manslaughter require intent to cause death and intent to cause serious physical injury, respectively, while second-degree or reckless manslaughter requires only a reckless state of mind.[8] Here, the trial judge charged first-degree manslaughter after determining that a reasonable view of the evidence would support finding that defendant meant to cause serious bodily injury, but did not actually intend to kill Ojeda or anyone else. In contrast, to obtain a second-degree manslaughter instruction, defendant needed to show that a reasonable view of the evidence supported finding that he recklessly caused Ojeda's death *without* intending to cause serious physical injury.

Again asserting that a trial judge must submit second-degree manslaughter as a lesser included offense of intentional homicide "unless the evidence entirely excludes the possibility that the defendant caused the death recklessly," defendant posits that "[o]nly in a truly 'exceptional case' will the wounds themselves be so numerous or extreme that they can be relied on to rule out a reckless homicide." He cites *People v Butler* (84 NY2d 627 [1994]) as an example of such an "exceptional case," noting that the victim there suffered three head contusions and 34 kitchen knife stab wounds, nine of which were lethal, while here, there were three stab wounds, only one of which was fatal.

First, as discussed earlier, defendant misstates the test for determining whether a trial judge must charge a lesser included offense. Second, the main issue in *Butler* was whether, since the trial judge gave an instruction on the possible effect of intoxication on the defendant's mental state, he was thereby required to instruct the jury on intentional and reckless manslaughter.

---

by the introduction of contradictory proof or by disclosure on cross-examination of faulty memory, bias, lack of adequate vantage point for observation and the like" (*id.* at 371).

**8.** A prima facie case of second-degree manslaughter entails "the creation of a substantial and unjustifiable risk; an awareness and disregard of the risk on the part of the defendant; and a resulting death" (*People v Licitra*, 47 NY2d 554, 558 [1979]).

We held that the judge was not under any such obligation, and repeated then-Judge Fuld's warning that a court

> " 'should avoid doing anything, such as submitting lower crimes in an inappropriate case, that would constitute an invitation to the jury to foreswear its duty and return a compromise or otherwise unwarranted verdict. Or, to express the matter in somewhat different terms, the jury's power to dispense mercy, by favoring the defendant despite the evidence, should not be allowed so to dominate the trial proceedings as to impede or interfere with the jury's primary fact-finding function' " (*id.* at 632, quoting *People v Mussenden*, 308 NY 558, 563 [1955]).

The People took the position in *Butler* that the "nature and brutality of the slaying," showed that the defendant could only have acted with an intent to kill, "irrespective of the arguable intoxication palliative offered to the jury" (*Butler*, 84 NY2d at 634). We agreed with the People that, in light of the facts in *Butler*, no instruction on either first- or second-degree manslaughter was "warranted or compelled" because "[t]he crime was intentional murder in the second degree or nothing, under the law and under the explicit instructions that were given" (*id.*).

Thus, *Butler* does not stand for the proposition, advocated by defendant, that reckless manslaughter *must* be charged unless a murder victim's wounds are "numerous or extreme." No minimum number of knife wounds is required to manifest intent (*see e.g. People v Lopez*, 72 AD3d 593, 593 [1st Dept 2010] [court properly declined to submit reckless manslaughter to the jury as a lesser included offense where a "(d)efendant's conduct in inflicting a very deep stab wound to the victim's vital organs could only be interpreted as evincing a deliberate design to cause the victim's death, or at least gravely injure him, and the crime was intentional or nothing"] [citing *Butler*]; *People v Henderson*, 110 AD3d 1353, 1354 [3d Dept 2013] [the defendant's request to charge the lesser included offense of second-degree manslaughter was properly denied where he "admitted that he intended to hurt the victim when he stabbed him and, based on the nature and force of the fatal stab wound, the only reasonable view of (his) conduct was that it was intentional"] [citing *Butler*]).

Finally, defendant argues that testimony from his brother Julio, if credited by the jury, would substantiate that he

harbored no animus towards Ojeda, but rather "acted recklessly in causing [Ojeda's] death during a chaotic barroom brawl[ ] . . . among numerous men all of [whom] had been drinking." And according to defendant, his pretrial statements, viewed in the light most favorable to him, show that he recklessly waved a knife around during the melee and did not even know that he had hurt anyone.

This record, however, does not reasonably support that defendant acted with mere recklessness. To credit defendant's pretrial statements about indiscriminately waving a knife, the jury would have to disregard the forensic pathologist's testimony that Ojeda's wounds could not have been inflicted in that way because they were stab wounds—the fatal one delivered forcefully enough to plunge five inches deep into his chest, piercing his left lung and cutting through a rib. The jury would have to discount the pathologist's uncontroverted description of the depth, angle and location of Ojeda's wounds, which were all delivered to the upper left chest area where vital organs (the heart, lungs) are located.

There is simply not any "identifiable, rational basis on which the jury could reject" the pathologist's testimony and the evidence of the nature and depth of Ojeda's wounds (see Scarborough, 49 NY2d at 369). Three penetrating stab wounds to the same person, who—according to defendant—picked a fight with him, is strong evidence of intent to cause at least serious physical injury, and inconsistent with defendant's pretrial claims that he aimlessly swung a knife in a crowd of people when caught up in the turmoil and panic of a bar fight, oblivious to the possible consequences of his actions and unaware that he had struck anyone. In sum, on this record there exists "[no] reasonable basis in the evidence for a finding of guilt of the lesser count and rejection of the greater count" (id.).[9]

Accordingly, the order of the Appellate Division should be affirmed.

---

**9.** The dissent argues that "it would be reasonable to conclude that defendant's intoxication rendered him unable to appreciate the risk of death he created by aggressively brandishing a knife in the middle of a barroom brawl," thus justifying a conviction for second-degree manslaughter (dissenting op at 127). On the dissent's theory of reckless manslaughter, though, the jury would have to speculate that defendant was too drunk to realize that he actually plunged the knife three times into Ojeda, as the undisputed forensic evidence showed, rather than merely waving it indiscriminately and defensively at a crowd, as he claimed in his pretrial statements. This goes well beyond viewing the evidence in the light most favorable to the defendant; rather, the dissent

Chief Judge LIPPMAN (dissenting). In my view, there exists a reasonable view of the evidence that would support a finding that defendant acted recklessly, but not intentionally, when he stabbed Edgar Ojeda, and defendant therefore was entitled to submission of the lesser included offense of second-degree manslaughter.

Defendant's intent has always been the central issue in this case.* The majority's lengthy opinion boils down to the erroneous assessment that the forensic evidence is *conclusive* on that issue. It is true that the nature and severity of the victim's wounds present "strong evidence of intent to cause at least serious physical injury" (majority op at 124). However, the question of whether a defendant was entitled to a charge-down "is not directed at whether persuasive evidence of guilt of the greater crime exists" (*People v Van Norstrand*, 85 NY2d 131, 136 [1995]). Indeed, for our purposes, "evaluation of the persuasiveness of the evidence of guilt of the greater crime is irrelevant" (*People v Green*, 56 NY2d 427, 434 [1982]).

Instead, our inquiry focuses on whether "there is a reasonable view of the evidence in the particular case that would support a finding that the defendant committed the lesser included offense, but not the greater" (*People v Heide*, 84 NY2d 943, 944 [1994]; *see also* CPL 300.50). Critically, to determine whether such a reasonable view exists, we are required to view the evidence in the light most favorable to defendant (*see e.g. People v Martin*, 59 NY2d 704, 705 [1983]; *People v Henderson*, 41 NY2d 233, 236 [1976]).

Viewed in that light, I believe that, notwithstanding the medical evidence, a jury could reasonably find that defendant committed reckless, rather than intentional, homicide. The trial testimony established that Ojeda was stabbed during a late-night barroom brawl between two groups of intoxicated men. When several of the People's witnesses attempted to downplay the chaos of the scene, they were impeached with testimony

---

constructs a scenario more favorable to defendant than his pretrial statements, apparently on the assumption that he may have been so drunk during the fight that he was unable to accurately recall afterwards how it had unfolded. (As noted earlier, the trial judge charged the jury to consider intoxication as relevant to defendant's intent.)

\* At defendant's first trial, where the court did submit second-degree manslaughter as a lesser included offense, the jury struggled with the mens rea element and sought "clarification of the terms 'bodily harm' and 'reckless action' " (*Matter of Rivera v Firetog*, 11 NY3d 501, 504 [2008], *cert denied* 556 US 1193 [2009]). Ultimately, jury deadlock resulted in a mistrial (*id.* at 503).

from defendant's first trial, in which they said the stabbing occurred amidst "a big ruckus," with "[p]eople running back and forth," "screaming," and "yelling." The testimony of defendant's brother Julio similarly depicted a melee in which "all the punches [were] going off" so that he was unable to discern the direction from which the blows were coming. Consistent with the depiction of drunken chaos and confusion, none of the four eyewitnesses who testified actually observed a knife in defendant's hand.

In addition, the People introduced defendant's pretrial statements, from which a jury could reasonably conclude that defendant, in a state of intoxication, wielded the knife in an attempt to repel his opponents, but that he lacked the intent to cause serious physical injury or death. In taking a contrary view, the majority fails to draw reasonable inferences in defendant's favor.

When questioned following his arrest, defendant explained that, moments after he approached Ojeda, the "crowd rose," and defendant "felt punches and grabbing" and the crowd "shifting" around him. He described receiving a blow from an unknown source beside or behind him, reaching for his knife, and "swing[ing] to get out of there." He also expressly denied acting intentionally. Instead he insisted that he "didn't mean it" and was "swinging [the knife] at the crowd," "trying to get out of there." Defendant also explained that he had been intoxicated and could recall almost nothing about Ojeda's appearance. When asked if he swung the knife at the person standing in front of him (Ojeda), defendant replied, "there [were] a few of them standing in front of me." Additionally, contrary to the majority's assertion, it is far from clear that defendant's mild gesticulation in the video was intended to be a reenactment of his motions with the blade. To draw such an inference ignores our duty to view the evidence in the light most favorable to defendant. Viewing defendant's fleeting hand motion in the appropriate light, a jury could reasonably decline to attribute significance to this unremarkable gesture.

Moreover, a factfinder would have reason to doubt the reliability of defendant's recollection given the evidence of his inebriation, which resulted in the issuance of an intoxication charge to the jury. The majority addresses this aspect of the case only to note that, in *People v Butler* (84 NY2d 627, 630 [1994]), we rejected a per se rule that an intoxication charge should automatically entitle a defendant to submission of reck-

less manslaughter as a lesser included offense. What the majority fails to recognize is that *Butler* itself acknowledged that it was an "exceptional case" (*id.* at 631), and noted the "generality" that, "in a great many cases in which an intoxication instruction may be warranted and is given, some corresponding lesser-included offense might be necessitated" (*id.* at 630, 631). In *Butler*, the "severity of the numerous wounds," 34 in total, "nine of which were individually fatal" (*id.* at 634), warranted an exception. Such an exception is not warranted here. Rather than 34 stab wounds, nine of them lethal, there were three stab wounds, one of which was fatal.

As *Butler* recognizes, entitlement to an intoxication charge will frequently coincide with a reasonable view of the evidence that a defendant possessed a reckless state of mind. Here, it would be reasonable to conclude that defendant's intoxication rendered him unable to appreciate the risk of death he created by aggressively brandishing a knife in the middle of a barroom brawl. Under our law, such failure of perception due to voluntary intoxication falls within the definition of recklessness (Penal Law § 15.05 [3] ["'(a) person who creates (a substantial and unjustifiable) risk but is unaware thereof solely by reason of voluntary intoxication also acts recklessly with respect thereto"]).

In addition, while there may well be "[n]o minimum number of knife wounds . . . required to manifest intent" (majority op at 123), Ojeda's wounds bore no resemblance to those in cases where the forensic evidence was dispositive of intent (*see Butler*, 84 NY2d at 629-630; *People v Vega*, 68 AD3d 665, 665 [1st Dept 2009] ["'49 stab wounds, mostly to (the) victim's neck and chest," penetrating "the heart, lung, liver and spleen"]; *People v Alexis*, 65 AD3d 1160, 1160-1161 [2d Dept 2009] [victim's throat slashed 14 times; two wounds severed the jugular vein]; *People v Collins*, 290 AD2d 457, 458 [2d Dept 2002] [six stab wounds; five fatal]). That Ojeda was stabbed twice in the back of his shoulder, as well as once in the front, reinforces the reasonableness of a finding that defendant swung the knife indiscriminately, albeit forcefully, while the crowd was "shifting" around him. The medical evidence does not, therefore, lead to an inexorable conclusion that "[t]he crime was intentional . . . or nothing" (*Butler*, 84 NY2d at 634).

Finally, the cases cited by the majority, in which defendants were denied a charge-down based on the nature of wounds less numerous than those in *Butler*, are readily distinguishable on

their facts, or lack thereof (*see People v Henderson*, 110 AD3d 1353 [3d Dept 2013], *and People v Lopez*, 72 AD3d 593 [1st Dept 2010]). While the circumstances surrounding the stabbing in *Lopez* are not recounted in the opinion, the stabbing in *Henderson* clearly occurred during a one-on-one confrontation in an apartment (*Henderson*, 110 AD3d at 1353), not a tumultuous altercation in the midst of a crowded bar. There was also proof in *Henderson* that the defendant confronted the victim, left to retrieve a knife, and committed the stabbing upon his return, having expressed a desire "to even the odds" (*Henderson*, 110 AD3d at 1353). Such circumstances are simply inapposite to the facts here, especially since there is no indication that either *Lopez* or *Henderson* involved evidence of intoxication.

In sum, the testimony regarding the chaotic bar fight, combined with defendant's post-arrest statements and the evidence of his intoxicated state, provided a reasonable basis to find defendant guilty of reckless manslaughter and to acquit on the intentional counts. Under these circumstances, it was reversible error to refuse defendant's request for a charge of manslaughter in the second degree. Accordingly, I would reverse the Appellate Division order and grant defendant a new trial.

Judges GRAFFEO, SMITH, PIGOTT and RIVERA concur with Judge READ; Chief Judge LIPPMAN dissents and votes to reverse in an opinion in which Judge ABDUS-SALAAM concurs.

Order affirmed.