# State of New York Court of Appeals

MEMORANDUM

This memorandum is uncorrected and subject to revision before publication in the New York Reports.

No. 57
The People &c.,
   Respondent,
  v.
Emmanuel Almonte,
   Appellant.

David Robles, for appellant.
Joshua P. Weiss, for respondent.

MEMORANDUM:

The order of the Appellate Division should be affirmed.

Supreme Court properly denied defendant's request to charge the jury on the lesser included offense of assault in the third degree (Penal Law § 120.00 [1]). Defendant failed

to "show that there [was] a reasonable view of the evidence in the particular case that would support a finding that he committed the lesser included offense but not the greater" (People v Rivera, 23 NY3d 112, 120 [2014]). Although "[i]n determining whether such a reasonable view exists, the evidence must be viewed in the light most favorable to [the] defendant" (People v Martin, 59 NY2d 704, 705 [1983]), charging the lesser included offense here "would [have] force[d] the jury to resort to sheer speculation" (People v Discala, 45 NY2d 38, 43 [1978] [citations omitted]; see Rivera, 23 NY3d at 121).

Nor does Supreme Court's admission of the call between the victim and the 911 operator require reversal. "A 'spontaneous declaration or excited utterance—made contemporaneously or immediately after a startling event—which asserts the circumstances of that occasion as observed by the declarant' is an exception to the prohibition on hearsay" (People v Cummings, 31 NY3d 204, 209 [2018], quoting People v Edwards, 47 NY2d 493, 496-497 [1979]). "The test is whether the utterance was made 'before there has been time to contrive and misrepresent, i.e., while the nervous excitement may be supposed still to dominate and the reflective power to be yet in abeyance'" (People v Brown, 70 NY2d 513, 517 [1987], quoting People v Marks, 6 NY2d 67, 72 [1959]; see also People v Nieves, 67 NY2d 125, 135 [1986]). Assuming, without deciding, that it was error to admit the 911 call, any such error would have been harmless (see People v Kello, 96 NY2d 740, 744 [2001]; People v Crimmins, 36 NY2d 230, 241-242 [1975]).

Finally, defendant's contention regarding the continued viability of the excited utterance exception to the hearsay rule is not preserved for appellate review.

People v Emmanuel Almonte

No. 57

RIVERA, J. (dissenting):

Defendant Emmanuel Almonte challenges his convictions for second-degree robbery, second-degree assault, and attempted first-degree assault on the grounds that the trial court failed to properly charge the jury on a lesser-included count of assault and

- 1 -

erroneously admitted the victim's out-of-court statements under the excited utterance exception to the rule against hearsay. The People's case rested upon the victim's testimony that defendant and codefendant stole his cell phone during a beating at gunpoint.[1] The jury—as the factfinder—was entitled to accept or reject all or part of that testimony, based on the credibility determinations it made and the inferences it drew from the properly admitted evidence. Then, in accordance with the trial court's instructions, the jury should have applied the law to its factual determinations to reach a verdict on all the criminal counts appropriately submitted by the court. That did not happen here because the jury was not given an opportunity to consider all the verdict options mandated by law and the jury heard inadmissible evidence that bolstered the victim's testimony. Therefore, I would reverse the Appellate Division order because defendant is entitled to a new trial on the assault counts.

I.

The People's case turned on the credibility of the sole eyewitness to the robbery and assault, victim JC. At trial, JC testified that he knew both defendant and codefendant personally for years: he had attended the same middle school as defendant and knew codefendant from high school. He then recounted how these two young men attacked him one night in the stairway outside his apartment.

---

[1] Codefendant, who was adjudicated a youthful offender, pleaded guilty to first-degree robbery prior to trial.

JC testified that defendant's cousin responded to an advertisement JC had posted to social media offering to sell a pair of popular sneakers for $500. Around 11:00 pm, JC texted the cousin, agreeing to sell him the sneakers that night. The cousin replied that "his cousin" would come to JC's home to pick up the sneakers. At approximately midnight, JC heard his doorbell. He testified that he had a "gut feeling" that something was wrong. Though he had agreed to the late-night sale and could not explain why he felt uncomfortable, he exited the apartment without the sneakers.

As soon as JC walked out the door of his apartment, he saw defendant and codefendant come at him from the stairway above his apartment and attack him at gunpoint. JC said he had an unobstructed view of the attackers' faces, that codefendant struck him on the back of the head with a gun, and that this caused him to fall onto the stairs. Defendant and codefendant then kicked him, and defendant took JC's cell phone out of his pants pocket. According to JC, as the assault continued, he grabbed the handrail of the stairway, at which point, defendant kneed him in his face, codefendant hit him in the head with the gun again, and they dragged him down the staircase. In an effort to escape, JC threw himself down the stairs towards the lobby, and tried to jump over the railing. As he held onto the railing, defendant punched his legs. JC then pleaded with defendant and codefendant not to kill him and offered to get the sneakers. Defendant and codefendant then walked JC back upstairs to his apartment at gunpoint. When JC rang the doorbell, his sister answered. JC and his sister yelled at each other and she closed the door. At some point after hearing JC's mother's voice from inside the apartment, the attackers dragged

JC back down towards the area between the lobby and the second floor. JC testified that he again pleaded with his assailants and told them he would get the sneakers. However, after JC's mother opened the door and yelled downstairs, the attackers fled.

JC testified that at this point he was bleeding from his head. In response to the prosecutor's question "do you know when, at what point, you got these cuts on your head?" JC answered, "at the point right when it happened, when I got pistol-whipped against the pole and I got kneed on my head by [defendant] and when [codefendant] comes again to get me off the rail hits me again with the gun." JC stated he was hit with the gun a total of three times.

After the attackers left, JC ran back up to the apartment. When his mother opened the door and saw him, she screamed because she saw he was covered in blood. "Right after [this]" his sister phoned 911. JC testified that he was in the bathroom cleaning himself and speaking with his mother while his sister spoke to the 911 operator.

The audio recording of this call was played for the jury. On the recording, the sister tells the dispatcher that "some guys" put a gun to her brother's head and that he is bleeding. When the dispatcher asks if they tried to rob JC, the sister can be heard asking "they take anything from you?" and after a pause responds to the dispatcher "No." The sister also initially told the dispatcher that her brother was shot, but moments later said she did not know why her brother was bleeding. JC testified that he did not talk to his sister while she was on the phone and that he did not tell her he was shot, because "better off she didn't

understand what was going on with the situation."  He did admit that he was talking to his mother during this call.

Within a couple of minutes, the dispatcher called back, and JC answered. In the recording of this call, which was played for the jury over defendant's objection, JC is heard in quick succession responding to a series of questions.

> "JC: Hello?
> DISPATCHER: Yes?
> JC: Hello? [inaudible] Can you send an ambulance to 150-
> DISPATCHER: Listen, listen, listen, listen, listen to me. The police are there. What happened?
> JC: Somebody put a gun to my head and they beat me up. They assaulted me.
> DISPTACHER: OK. The police are there, OK? [inaudible] You're still in the apartment?
> JC: Can I get
> DISPATCHER: OK, hold on. And what did they look like?
> JC: [inaudible] stitches to my head.
> DISPTACHER: What did they look like? How many were there and what did they look like?
> JC: There was two, there was two. One of them had a, they had their hoodies on [inaudible] coats.
> DISPATCHER: But were they black, white, or Hispanic?
> JC: They were Dominican.
> DISPATCHER: They were Hispanic. And they were wearing what color hoodie?
> JC: They were wearing a navy blue, a navy blue, um, navy blue sweater.
> DISPATCHER: Navy blue sweater?
> JC: Yeah.
> DISPATCHER: Where did they run off towards?
> JC: With a hoodie-they had a hoodie.
> DISPATCHER: Where did - where did they run off towards?
> JC: They just ran down the stairs, [inaudible] outside my house.
> DISPATCHER: OK.
> JC: They had, they had, one of them had a tattoo on their hand [inaudible].

> DISPATCHER: Alright. Can you open the door for the police?
> Or, were you shot sir, or no?
> JC: Huh?
> DISPATCHER: Were you shot?
> JC: No, no, they put a gun to my head and they assaulted me.
> DISPATCHER: OK, alright, I'm going to let the police know.
> Can you open the door?"

Defendant and the People do not dispute the trial court's factual finding that the incomprehensible voice in the background throughout the call is JC's mother yelling.

During JC's testimony, the prosecutor played the building's surveillance video. The video is poor quality and does not capture the entire stairwell where the attack occurred. To the extent human images are visible, they are difficult to discern and to interpret. However, JC testified that the partial scenes in the video represent the lobby and first level stairway and depict JC as he tries to jump over the railing to escape and then holds the railing while being attacked by defendant and codefendant.

Given that no gun was recovered, and no forensic evidence tied defendant to the attack, the People's case would rest on the jury's determination of JC's credibility. JC's criminal history was thus a probative issue. During direct examination, JC explained that while working at a large department store, he filled two gift cards for himself, and changed one of them for cash back at a different branch. On cross-examination, defense counsel questioned JC in greater detail—emphasizing that the thefts occurred after the assault and that JC's crimes involved lying to his employer. JC admitted that he had used another coworker's identification number to create the gift cards and that while he knew it placed that employee at risk of being arrested, he "did not care." Defense counsel also challenged

JC's credibility by repeatedly asking JC for any reason or motive that his two school mates, with whom he had been on good terms would violently attack him. JC gave no reasons but offered that he had never robbed defendant or his cousin and had no issues with them, to which defense counsel asked rhetorically, "[w]e only have your word for that; is that right?"

To corroborate JC's testimony, the prosecutor presented testimony from two police officers, one had responded to the 911 call, the other spoke to JC at the precinct. Both officers observed that JC was bleeding from the head. According to the officer who arrived at the apartment within a "few minutes" of the callback, JC described the two attackers as light-skinned Dominican men with light eyes, whom he knew from the neighborhood. Inexplicably, JC did not provide the officer with their names or the codefendant's address, not even while the police drove him around in search of the attackers. The police subsequently took JC to the hospital where he was treated for his injuries. At the precinct the next day, JC identified defendant and codefendant.

The People also presented testimony from the physician who treated JC at the hospital. The physician explained that JC reported he had been hit with a gun. When the prosecutor asked whether JC's injuries were consistent "with being struck with a hard metal object," the physician opined: "[t]he lacerations [were] consistent with being hit by an object. I couldn't necessarily say if it was metal or wood or glass. It's not just fists. This wouldn't cause those lacerations on the back and the top of the head." On cross-examination, defense counsel asked if the lacerations could be caused by a metal railing,

to which the physician replied, "I would assume that a sharp edge would cause the lacerations on the head, though I can't say what type of sharp object that was."

During the charge conference, defense counsel objected to the prosecutor's request to withdraw the charge of third-degree assault. Counsel argued the charge was a lesser-included offense of second-degree assault and must be submitted to the jury because the injuries could have been caused without the use of a dangerous instrument, an element required for second-degree assault but not third-degree assault. He asserted that the injuries could have occurred "from [JC] falling, hitting his head. I mean, you know—the medical professional testified that could have happened any number of ways. There was a melee." Over counsel's objection, the court did not submit this count, stating "the CPL gives the Court considerable discretion as to which counts are being submitted."

The court submitted first-degree robbery, two counts of second-degree robbery, attempted first-degree assault and second-degree assault. Accordingly, the jury was instructed as follows. To find defendant guilty of robbery in the first degree (Penal Law § 160.15 [3]), the jury must have found that defendant, personally or by acting in concert with another person, forcibly stole property from JC, and "that in the course of the commission of the crime or in the immediate flight therefrom, the defendant or another participant in the crime possessed a dangerous instrument and used or threatened to use that dangerous instrument." On the first count of second-degree robbery (Penal Law § 160.10 [1]), the People must have proven that defendant forcibly stole property from JC and was aided by another person actually present. As to the second count of second-degree

robbery (Penal Law § 160.10 [2] [a]), the People must have proven that defendant either personally or by acting in concert with another person forcibly stole property from JC and that "in the course of the commission of the crime the defendant or another person in the crime caused physical injury to [JC] and [JC] was not a participant in the crime."

With regards to the assault counts, the court explained that in order to find defendant guilty of attempted first-degree assault (Penal Law §§ 110, 120.10 [1]), the jury must find that defendant "personally or by acting in concert with another person attempted to cause serious physical injury to [JC] by means of a dangerous instrument" and "that the defendant did so with the intent to cause serious physical injury to [JC]." For the count of second-degree assault (Penal Law § 120.25 [2]), the People must have proven that defendant "personally or by acting in concert with another person caused physical injury to [JC] by means of a dangerous instrument" and "that the defendant did so with the intent to cause physical injury to [JC]."

During deliberations, the jury sent a note requesting to hear the 911 calls, which were played twice in quick succession. The jury also sent a note requesting clarification on the definition of a dangerous instrument:

> "We would also like to request the clarification as to what a dangerous instrument is, specifically if a dangerous instrument can be part of the surrounding crime scene, for example, the railing or the stairs? Does it have to be a structure that can be physically transportable?"

In response, the judge instructed the jury as follows:

> "under the circumstances of this case . . . a dangerous instrument cannot be part of the surrounding crime scene, can't

be the railing or the stairs. It does have to be an instrument that could be physically transportable and, as you know, it's the People's theory that the dangerous instrument was a pistol in this case."

The jury convicted defendant of both counts of second-degree robbery and both assault counts, and acquitted defendant of first-degree robbery. The Appellate Division affirmed the judgment and a Judge of this Court granted leave to appeal (People v Almonte, 160 AD3d 594 [1st Dept 2018], lv granted 32 NY3d 934 [2018]).

## II.

Defendant challenges his conviction on three grounds: (1) the trial court erroneously refused to charge the jury on the lesser-included offense of assault in the third degree; (2) JC's 911 callback statements were not admissible under the excited utterance exception to the rule against hearsay; and (3) the Court should abolish the excited utterance exception because it is based on erroneous assumptions about human behavior that have been disproven by scientific evidence. I agree that defendant's first two claims have merit.

As defendant argues, there is a reasonable view of the evidence that JC's injuries were caused by something other than a dangerous instrument or deadly weapon, supporting a verdict of third-degree assault. Defendant is also correct that there is record evidence that JC's 911 callback statements were calculated responses intended to omit key information, and thus were a product of reflective capacity and not within the excited utterance exception to the hearsay rule. Although he presents an interesting argument,

defendant's macro level attack on the excited utterance exception is not properly before the Court, as trial counsel failed to create a record of the scientific evidence appellate counsel now relies upon to support the abolition of the exception.

A. Lesser-Included Offense Jury Charge

Under CPL 300.50 (1), a trial court may "submit in the alternative any lesser included offense if there is a reasonable view of the evidence which would support a finding that the defendant committed such lesser offense but did not commit the greater" (CPL 300.50 [1]). However, if either party requests that a lesser-included offense be submitted, and such offense meets the standard of CPL 300.50 (1), the court must submit it to the jury (CPL 300.50 [2]). In other words, the court has no discretion when the evidence supports the request to charge the lesser-included offense.

The Court has consistently held that the standard for submitting a lesser-included offense sets a low threshold that favors the moving party. At its core, the standard reflects the jury's authority to make findings of fact and power to dispense mercy. Juries are "free to accept or reject part or all of the defense or prosecution's evidence" and may find a defendant guilty of a lesser offense even where there is convincing evidence of guilt on a greater charge (People v Henderson, 41 NY2d 233, 236 [1976]; see also People v Malave, 21 NY2d, 29 [1967]). Thus, when deciding whether a jury should contemplate a lesser-included offense, "[o]ur inquiry is not directed at whether persuasive evidence of guilt of the greater crime exists . . . but whether, under any reasonable view of the evidence, it is

possible for the trier of facts to acquit defendant on the higher count and still find [defendant] guilty on the lesser one" (People v Van Norstrand, 85 NY2d 131, 136 [1995]; see People v Discala, 45 NY2d 38, 42 [1978]; Henderson, 41 NY2d at 236).  Indeed, we have held that the "appraisal of the persuasiveness of the evidence indicating guilt of the higher count is irrelevant" (Henderson, 41 NY2d at 236).  To that end, the Court must view the evidence in the light most favorable to the defendant, with due regard to all proper inferences to be drawn from the record (see Van Norstrand, 85 NY2d at 136 [finding that the jury could infer defendant lacked the requisite mens rea for first-degree assault]; Henderson, 41 NY2d at 236 [finding that the jury could infer that defendant lacked the intent required for burglary and instead convict defendant of trespass]; Malave, 21 NY2d at 29 [finding that the jury could infer that defendant possessed, but did not sell narcotics, based on his testimony that he was a drug user]).  We have long recognized that "[t]he net effect of submitting the lesser charge may be that the jury will simply extend mercy, but this is acknowledged to be an 'inevitable consequence of the jury system'" (Discala, 45 NY2d at 42, quoting People v Mussenden, 308 NY 558, 562 [1955]).

Here, the trial court refused to instruct the jury on third-degree assault, which requires that the defendant, with intent to cause physical injury to another person, cause such injury (Penal Law § 120.00).  Thus, the court failed to submit the only assault count requested that did not require a factual finding that defendant caused physical injury by means of a dangerous instrument.  On the facts of this case, that was error.

No gun was recovered and according to JC, he was in direct contact with the railing, a pole, and the steps during the attack. Specifically, JC testified that the attackers twice dragged him down the stairs, he threw himself down the stairs towards the lobby, and he grabbed the railing while he was pummeled by his attackers until they forced him to let go. He stated that his head injuries were inflicted when he was "pistol-whipped against [a] pole" and kneed in the head by defendant, and when codefendant hit him with the gun while he held onto the railing. Additionally, the treating physician stated that she could not identify the object that caused the lacerations on JC's head.

Based on the record before us, there was a reasonable view of the evidence to support a jury finding defendant guilty of third-degree assault but not guilty of the higher assault counts. The evidence, viewed, as it must, in the light most favorable to defendant, permitted the jury to conclude that JC's injuries were not caused by a gun or another dangerous instrument, but instead by a sharp edge that he hit as he was knocked around the staircase, dragged down multiple steps, holding onto the railing, throwing himself down the stairs, or kneed in the head while against a pole.

Contrary to the People's assertion, the jury would not have to engage in "sheer speculation" to doubt JC's narrative that a gun caused his head injuries. The jury was free to reject JC's testimony that he was injured when codefendant hit him in the head with a gun (see Henderson, 41 NY2d at 236), and the jury's actions suggest they did. The jury acquitted defendant of a count of first-degree robbery that required the use or threatened use of a dangerous instrument—which, under the court's instruction, could only have been

a gun—while convicting him of two counts of second-degree robbery that only required the use of force (see Penal Law §§ 160.15 [3], 160.10 [1], [2] [a]).  Significantly, the jury also sent a note to the court during deliberations asking whether the railing or stairs could be a dangerous instrument.  The jury would have no reason to ask this question if it was not specifically considering an alternative view of the evidence explaining the cause of JC's injuries.  Lastly, the jury had ample basis to question JC's credibility and his motive for claiming that he was assaulted at gunpoint.  JC failed to identify defendant on the 911 callback and to the officers during the neighborhood canvas in search of the attackers, and he previously used an innocent coworker's company registration number to steal from his employer, admitting that he did not care that he placed her at risk of arrest for his criminal actions.

To the extent the People argue that inferences cannot be drawn in favor of defendant, we have never refused to apply the usual rules of inferential factfinding when evaluating a request for a lesser-included offense charge (see Van Norstrand, 85 NY2d at 136; Henderson, 41 NY2d at 236; Malave, 21 NY2d at 29; Criminal Jury Instructions, Evidentiary Inferences ["In evaluating evidence, you may consider any fact that is proven and any inference which may be drawn from such fact"]).  Nor have we expressly held that evidence supporting a lesser-included offense charge may only come from direct testimony or incontrovertible proof.  Apart from an unprecedented rejection of our traditional rules, the People's narrow view of the trial evidence would turn a standard favorable to the defendant into an insurmountable obstacle in cases, such as defendant's, where the sole

eyewitness is also the victim.  Here, the People's approach would require JC to expressly reject his own testimony by stating that his injuries were or could have been caused by something other than a gun.  However, such a counter-narrative is not required for the lesser-included offense charge because the jury could reject JC's testimony that he was hit by a gun on the basis of credibility determinations that were informed by evidence supporting a different cause of the injury.  Any analysis that forecloses the submission of the lesser-included offense by precluding the jury from crediting that portion of JC's testimony that suggests his injuries were sustained when he was kicked, kneed, and dragged down a staircase, while also discrediting the portion of his testimony that his injuries were caused by a gun, would be in contravention of the jury's quintessential factfinding role (Henderson, 41 NY2d at 236).

The People also unpersuasively argue that the verdict on the higher assault counts establishes that the jury determined that a dangerous instrument caused JC's head injuries, especially given that the judge instructed the jury that a railing or stairwell could not constitute a dangerous instrument.  This view does not square with defendant's acquittal on the first-degree robbery count, which required the use of a dangerous instrument or deadly weapon.  Equally unpersuasive is the People's argument that the jury may have exercised mercy or concluded that codefendant used the dangerous instrument during the assault but not during the commission of the robbery to forcibly steal JC's cellular phone.  This view of the evidence is belied by JC's testimony that the assault was fast-paced and

violent, that he was hit with the gun a second time after defendant removed the phone from his pants, and that he was sufficiently frightened to plead for his life.

The People essentially urge us to let stand convictions that may have resulted from a choice between acquittal and conviction of the offense charged even if the jury would have chosen otherwise. We have previously rejected just such a choice because of its coercive framing (see People v Green, 56 NY2d 427, 433 [1982] ["From the perspective of the accused, submission of a lesser included offense enables the jury to extend mercy by providing a less drastic alternative than the choice between acquittal and conviction of the offense charged"]; People v Granger, 187 NY 67, 72 [1907] ["Of course, the court could not coerce the jurors and force a conviction for a greater crime than they would otherwise have found him guilty of, by withholding from their consideration a lesser degree authorized by the evidence and instructing them to acquit if they did not find him guilty of the greater crime."]). The People's view is also at odds with our directive that consideration of a lesser-included offense must focus exclusively on whether, under a reasonable view of the evidence, it is possible for a jury to convict defendant of the lesser offense and acquit of the greater offense, without regard to persuasive evidence of guilt on the greater offense (see Van Norstrand, 85 NY2d at 136).

In sum, there is a reasonable view of the evidence based on JC's testimony about the location and nature of the attack; the physician's testimony that the injuries were caused by a sharp object of uncertain material; and JC's impeached credibility that would permit the jury to draw the inference that JC's injuries were inflicted by a sharp edge in the

stairwell, and not by a gun. This is like any other reasonable inference that a jury may draw based on evidence of injuries inflicted in the course of a struggle or attack involving dangerous surroundings, or even from a fall or misstep down a staircase. The trial court should have charged the jury on the lesser-included assault offense.

Defendant contends this error warrants reversal on all counts. As defendant sees it, the counts are factually related because the People's theory of the case was that the cell phone was stolen during the course of the assault in the stairwell. Defendant's argument is fundamentally flawed. The trial court instructed, and the jury convicted defendant, on one count of robbery that required the People to prove beyond a reasonable doubt that defendant forcibly stole property from JC with the aid of another person actually present (Penal Law § 160.10 [1]). The court also instructed, and the jury convicted defendant, of another count of robbery that required the People to prove that defendant personally, or in concert with another, forcibly stole property from JC, and that in the course of the crime defendant or another caused JC physical injury (Penal Law § 160.10 [2] [a]). The jury thus convicted defendant of robbery counts that did not require forcible stealing with the threat or use of the gun. The failure to submit the option of third-degree assault did not taint the robbery convictions as the jury necessarily rejected a robbery verdict based on JC's testimony about the attackers' use of the gun in furtherance of the theft of his phone.

For the reasons I have discussed, the trial court's erroneous denial of the request to submit the third-degree assault count to the jury, based on its presumed discretionary

authority where the law provides for none, requires reversal of defendant's second-degree assault and attempted first-degree assault convictions.

B. Excited Utterance Exception as Applied at Defendant's Trial

It is undisputed that JC's statements to the 911 dispatcher are hearsay as they are out-of-court statements offered by the People for the truth of the matter asserted, i.e. to establish that JC's injuries were caused by a hit to the head with a gun used by the attackers during the assault. Defendant claims the court should not have admitted this hearsay. The People assert that the callback statements are admissible under the excited utterance exception because JC was under the effect of a startling event, having been beaten minutes before making the statements, and having suffered injuries to his head that left him bleeding and in need of medical attention. In rejecting defendant's argument, the majority assumes error and finds it to be harmless (majority op at 2). I need not assume what is plain from the record: JC's statements were a product of his calculated choice to withhold identifying information about his attackers, evincing a reflective capacity that takes the statements outside the ambit of the excited utterance exception.

In People v Cummings (31 NY3d 204 [2018]), we reiterated the purpose and elements of the excited utterance exception and confirmed our intent that this judicially created exception encompass a narrow category of statements, unscripted and born of impulse. We explained that "[a]lthough hearsay, excited utterances may be admissible because, 'as the impulsive and unreflecting responses of the declarant to the injury or other

startling event, they possess a high degree of trustworthiness, and, as thus expressing the real tenor of said declarant's belief as to the facts just observed by [the declarant], may be received as testimony of those facts'" (id. at 209, quoting People v Caviness, 38 NY2d 227, 231 [1975]). "Excited utterances are exceptions to the hearsay rule because the declarant is exposed to a startling or upsetting event that is 'sufficiently powerful to render [the declarant's] normal reflective processes inoperative'" (People v Cantave, 21 NY3d 374, 381 [2013], quoting People v Vasquez, 88 NY2d 561, 574 [1996]). Accordingly, in order to qualify as an excited utterance, a statement must be "made contemporaneously or immediately after a startling event which effected or was observed by the declarant, and relate to the event" (People v Nieves, 67 NY2d 125, 135 [1986]; see People v Edwards, 47 NY2d 493, 496-497 [1979]).

As a threshold matter, the question presented in this appeal is whether the record evidence supports the trial court's conclusion that the victim lacked reflective capacity, based on the facts as found by that court. Defendant maintains that the record is to the contrary: JC's misrepresentations to the 911 dispatcher, and specifically his omission of the identity of his assailants, established that he did not lack reflective capacity. I agree.

First, as the trial court found, several minutes elapsed between the attack and the victim's statements to the dispatcher, providing JC with ample opportunity to reflect on the events and to decide what he would say about the attackers. Second, as the trial court also found, and JC conceded, during the moments immediately after the attack and before talking to the dispatcher, he spoke to his mother and chose not to tell his sister what

happened because it was "[b]etter off she didn't understand what was going on with the situation." Third, JC did not call 911 seeking immediate medical assistance for his injuries or to report the crime, but instead answered the phone when the dispatcher called back.

JC's statements during the callback are particularly notable and revealing. He did not say he knew the attackers and did not provide their names or the co-defendant's address, despite knowing this information. These were strange omissions given that he knew defendant and codefendant for years, had attended school with them, and had clearly recognized them when he stepped out of his apartment. When asked what happened, he said only that "somebody" attacked him and when first asked what they looked like, he said he needed stitches. JC made no reference to the theft of his cell phone. When asked again what the assailants looked like and how many were involved, he identified them by their subethnic group and eye color. Subsequently, when asked where the attackers fled, he answered down the stairs and offered an additional response, unrelated to that question, saying that one of them had a tattoo on his hand. All the while, JC failed to provide the most crucial identifying information—name and address—that would best enable the police to find the attackers and distinguish them from the hundreds of other young males in the neighborhood. Indeed, if JC had the presence of mind to say what these attackers wore, and that one of them had a tattoo, it is incredible that he would not also think to say who they were supposedly because it did not come to mind. It requires a strained view of these events to conclude that JC spoke on impulse, automatically, without a second thought, to identify these former schoolmates as "Dominicans" rather than by their names.

Even under a moment of incredible stress, if you have just been attacked by someone you know well, is your first thought to tell the police the attacker's ethnic origin rather than their name?

Even if, as the trial court found, the victim sounded excited within minutes of the attack, his speech pattern alone does not establish that his statements were spontaneous. A declarant can sound excited and still quickly act on deliberative intent (see Cantave, 21 NY3d at 382). Just so here, where JC's statements evinced calculated choices to withhold information from the police and his family. In this regard, defendant's case is similar to Cantave, where a recorded 911 call was deemed not an excited utterance because the declarant reported an assault but omitted the facts that he personally knew the assailant and had injured him (id.). Similarly, JC's choice to omit both of the attackers' names makes his statements anything but spontaneous and without forethought.

As the record does not support the trial court's conclusion that JC lacked reflective capacity, the statements are not an excited utterance as a matter of law. Thus, they were not admissible under this hearsay exception.

Neither is the error harmless as the majority concludes. JC's statements to the 911 operator were crucial to support his narrative. The People heavily relied on the statements, playing the recording of the 911 callback during its case-in-chief and summation, to argue that JC was attacked with a gun even though one was never found. The jury considered the statements significant, as it requested to hear the recording twice during deliberations.

Contrary to the People's argument, JC's statements were not cumulative because the only other evidence that a gun was used came from his in-court testimony. Nor is admission of the statements excusable because JC took the stand and was cross-examined, as this allowed the People to capitalize on JC's unreliable out-of-court statements to bolster his in-court credibility before the jury. It undermines the purpose of the rule against hearsay: to exclude out-of-court statements because their unreliability may have an adverse impact on the truth-seeking process (see People v Brown, 80 NY2d 729, 736 [1993] [noting that hearsay is admissible only where there are "sufficient safeguards to assure the statement's reliability"]; Martin, Capra, Rossi, New York Evidence Handbook, §§ 8.1, 8.1.2 n 13 ["(T)he traditional definition of 'hearsay' insists upon the opportunity for contemporaneous cross-examination—that is, cross-examination at the time the statement is first made, not later—at the time the witness repeats it on the stand"]).[2]

### III.

Alternatively, defendant argues that the excited utterance exception should be abolished because the exception is unworkable and fails to serve its intended purpose. In support of these arguments, defendant cites to judicial opinions and scholarly articles that have advocated for abandoning the exception (see Cummings, 31 NY3d at 213-214 [Rivera, J., concurring]; United States v Boyce, 742 F3d 792, 801-802 [7th Cir 2014]

_____

[2] Any unpreserved potential alternative ground to admit JC's 911 callback statements are not properly before us on this appeal. Accordingly, I do not address the People's argument that the statements were otherwise admissible.

[Posner, J., concurring]; Steve Baicker-McKee, The Excited Utterance Paradox, 41 Seattle U L Rev 111, 163 [2017]; Alan G. Williams, Abolishing the Excited Utterance Exception to the Rule Against Hearsay, 63 U Kan L Rev 717, 719-720 [2015]; Aviva Orenstein, "My God!": A Feminist Critique of the Excited Utterance Exception to the Hearsay Rule, 85 Calif L Rev 159, 178 [1997]).

Defendant asserts that trial counsel's argument that JC's statements were not spontaneous was sufficient to preserve a challenge to the excited utterance exception. Defendant is incorrect. The record establishes that counsel's arguments focused on whether the facts established the application of the existing rule to defendant's case, not that the rule should be abolished or disavowed because it is unworkable as a general matter. Nor did the court below decide the question presented, which would have preserved the question for our review (CPL 470.05 [2]), because the trial judge considered only the events related to the attack and JC's 911 callback statements in deciding that the exception applied.

While only this Court can determine whether to abolish this judicially created exception to our hearsay rules, that does not provide grounds for us to consider his challenge. Our review is strictly limited to questions of law (NY Const, Art VI, § 3 [a]; People v Leonti, 18 NY2d 384, 390 [1996]. Given that defendant's arguments in our Court are based, in part, on academic literature, and the scientific community's evolving understanding of human behavior and an individual's capacity to fabricate under stressful conditions, defendant should have developed a record below on the state of the science.

This would have permitted the trial court to render a decision on whether, apart from the legal scholars' criticism of the exception, there is support for the proposition he asserts here, and also would have allowed the People to respond.

## IV.

I would reverse the Appellate Division order because defendant is entitled to a new trial on the assault counts. Under our well-settled law, because a reasonable view of the evidence supports the lesser-included offense charge of third-degree assault requested by defendant, the court had no choice but to submit this count for the jury's consideration. Compounding the error, the court applied the excited utterance exception expansively to statements that evinced the declarant's reflection on the events, in contravention of existing law. The exception does not apply when the declarant makes a calculated decision to withhold critical information about the startling event. Regardless of the declarant's motivation, such deliberately crafted statements are not impulsive and cannot be treated as reliable. I dissent.

People v Almonte

No. 57

WILSON, J. (dissenting):

I concur in Judge Rivera's dissenting opinion except that I agree with the majority that the admission of the audio recording of the 911 call was harmless on the facts present here.

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

Order affirmed, in a memorandum.  Judges Stein, Fahey, Garcia and Feinman concur.  Judge Rivera dissents in an opinion.  Judge Wilson dissents in a separate dissenting opinion.  Chief Judge DiFiore took no part.

Decided June 27, 2019