[47 NYS3d 253]

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v DIANN GROHOSKE, Appellant.

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v CALVIN GROHOSKE, Appellant.

First Department, January 31, 2017

**APPEARANCES OF COUNSEL**

*Tesser, Ryan & Rochman, LLP*, New York City (*Irwin Rochman* of counsel), for appellants.

*Cyrus R. Vance, Jr., District Attorney,* New York City (*Alexander Michaels* and *Alan Gadlin* of counsel), for respondent.

## OPINION OF THE COURT

SAXE, J.

This unusual kidnapping case raises interesting issues regarding the related crimes of unlawful imprisonment and kidnapping and the elements of each, and whether the evidence presented here satisfactorily established those elements. It also provides a lesson to those who believe that the summary proceedings available under the Real Property Actions and Proceedings Law to lawfully evict tenants are not summary enough.

In September 2013, Daniel Lawson, a 25 year old student at the Fashion Institute of Technology, prompted by a listing on Craigslist, agreed to sublet a bedroom in a four-bedroom West Harlem apartment from defendant Calvin Grohoske, who, along with another person, had leased the apartment from the building's owner. Calvin and his co-lessee made a practice of subletting some of the individual bedrooms in their apartment to various people. Calvin, who had lived in one of the rooms, sublet his room because in August 2013 he moved back to Texas, where his elderly parents owned a cattle ranch, so he could take care of them.

The agreement was that Lawson would pay Calvin a $1,000 security deposit and $1,000 per month for the room. Lawson apparently paid the security deposit, and $864 of his $1,000 rent due for October, by the time he moved into the sublet room on October 1, 2013. However, Lawson experienced difficulties in the apartment from the outset, when he learned that a man identified as the drug dealer for one of his roommates had forced his way into the apartment and confronted another of his roommates. By the middle of October 2013, Lawson had announced that he would not make any more payments for the apartment, and that "the deal was off."

A flurry of text messages from Calvin were sent to Lawson, threatening him and telling him to vacate the apartment. On October 24, 2013, Lawson sent Calvin a Facebook message telling him to count the $1,000 security deposit toward his rent, which he said would cover the rest of October and the first half of November, and that he would be vacating by the end of that period. After noting that he had heard that Calvin might come to New York, Lawson wrote,

"[I]f you cross into my personal space, which I have
paid and paid for at a premium, touch or mess with
any of my belongings or my animal, or to try to
engage with me in the state that I am in right now,
I would rather fling open the gates of hell if I were
you."

Calvin replied quickly, advising Lawson that his failure to
pay the rent resulted in a termination of the agreement. He
advised Lawson to be out of the apartment by the end of
October and said that he was going to submit a wage garnish-
ment for Lawson's unpaid rent. Calvin said he arranged with
another person to rent the room as of the end of October.

According to Calvin, to clean and prepare the apartment for
the new tenant's occupancy at the end of October, Calvin and
his mother (both then in Texas) decided to come to New York.
On October 29, 2013, the two of them flew from Texas to New
York. Upon arrival, they purchased a new door lock at a Home
Depot for the room that he had rented to Lawson, with the
hope of changing the lock while Lawson was out of the apart-
ment.

At about 10:30 p.m. that day, Calvin and his mother, defend-
ant Diann Grohoske, arrived at the apartment. Lawson testi-
fied that he was in bed, naked, with the lights off, watching
Downton Abbey on his computer, when Calvin charged into the
room, straddled Lawson on the bed and began punching him in
the face; there was also testimony that Calvin "kneed" Lawson
in the face. Lawson testified that Diann walked into the room
carrying a gun; Diann denied having a gun at any time. Ac-
cording to Lawson, Diann instructed Lawson to get dressed
and then to get down on the floor on his knees where Calvin
applied duct tape to his wrists so that they would be bound
behind his back like handcuffs. Duct tape was also placed
around his chest so that his arms were held to his side. Calvin
secured Lawson's cat, Pookie, in a cardboard box, securing it
with duct tape. Lawson said that they also took his cell phone
and wallet, which assertion Calvin and Diann denied. Lawson
protested to these events by stating to Calvin and Diann that
he had "squatter's rights" to the room, and that Calvin had to
proceed to landlord-tenant court to obtain an order of eviction
before throwing him out. To this, Lawson asserts that Calvin
responded, "That's not how we do it in Texas."

Calvin and Diann led Lawson downstairs. He was placed in
the front passenger seat of Calvin's rental car, with Diann sit-

ting behind him and Calvin in the driver's seat. Calvin put the duct-taped box containing the cat into the trunk of the car. According to Calvin, he had offered to drop Lawson at a shelter, but Lawson refused because a shelter would not be able to accommodate both him and Pookie the cat. According to Lawson, they proceeded onto the New Jersey Turnpike with Calvin driving and Diann sitting behind him with a gun to the back of his head. At about 12:50 a.m. the car left the New Jersey Turnpike and traveled across the Betsy Ross Bridge into Philadelphia. They eventually arrived at a deserted area in Philadelphia, where Calvin pulled over, and together Calvin and Diann forced Lawson out of the car and threw the cat box out on the street from the trunk. According to Lawson, he was shoved against a fence, and Diann cut some of the duct tape off him and told him, "[I]f you ever come back you are dead." Calvin and his mother then drove away.

Lawson was able to free himself of the remaining duct tape and began to open the cat box. Apparently Pookie the cat was frightened by the experience of being boxed in an automobile trunk, because as Lawson tried to open the box, the cat jumped out and ran off, never to be seen again.

Ultimately, Lawson located a police station, and reported the unusual events. It was then about 1:20 a.m. The right side of Lawson's face was red and the right front of his glasses were broken and the right lens of his glasses had popped out. A residue of duct tape was found in the area where he had been dropped off.

Defendant Calvin Grohoske was convicted at trial of kidnapping in the second degree and two counts of robbery in the second degree, but acquitted of robbery in the first degree and one count of torturing and injuring animals. He was sentenced to a prison term of nine years for the kidnapping count and eight years for each of the robbery counts, all to run concurrently, plus five years of postrelease supervision. Defendant Diann Grohoske was convicted of the second-degree kidnapping count and one count of robbery in the second degree, and sentenced to a five year prison term plus five years of postrelease supervision.

On appeal, defendants contend that their convictions must be reversed because the trial court failed to charge a lesser included offense, and, in the alternative, that their convictions for kidnapping in the second degree must be reversed because the evidence failed to establish all of the elements of the crime.

Diann Grohoske further contends that there was insufficient evidence of her participation in the robbery.

In determining whether a verdict is supported by legally sufficient evidence, the reviewing court must decide "whether there is any valid line of reasoning and permissible inferences which could lead a rational person to the conclusion reached by the jury on the basis of the evidence at trial," and as a matter of law satisfy the proof and burden requirements for every element of the crime charged (*People v Bleakley*, 69 NY2d 490, 495 [1987]; *see People v Danielson*, 9 NY3d 342, 349 [2007]).

A person commits second-degree kidnapping "when he abducts another person" (Penal Law § 135.20). "Abduct" means "to restrain a person with intent to prevent his liberation by either (a) secreting or holding him in a place where he is not likely to be found, or (b) using or threatening to use deadly physical force" (Penal Law § 135.00 [2]). "Restrain" means:

> "to restrict a person's movements intentionally and unlawfully in such manner as to interfere substantially with his liberty by moving him from one place to another, or by confining him either in the place where the restriction commences or in a place to which he has been moved, without consent and with knowledge that the restriction is unlawful. A person is so moved or confined 'without consent' when such is accomplished by (a) physical force, intimidation or deception" (Penal Law § 135.00 [1]).

As the Court of Appeals has explained, an "abduction is either restraint in a place where the victim is unlikely to be found or restraint through the actual or threatened use of deadly physical force" (*People v Gonzalez*, 80 NY2d 146, 150 [1992] [citations omitted]).

Defendants contend that neither statutory meaning of the word "restrain" was established by the evidence, since (1) a car on a public thoroughfare does not constitute a place where the victim was not likely to be found under Penal Law § 135.00 (2), and (2) the jury's acquittal of them for the charge of first-degree robbery precludes a finding that they used or threatened to use deadly physical force. Defendants employ too narrow a construction of the term "restrain."

■ Even assuming that the jury's acquittal on the first-degree robbery charge warrants the conclusion that defendants did not use or threaten to use a gun, the evidence that defendants made Lawson put his hands behind his back, bound him

with duct tape, took his cell phone and wallet from him, forced him into a car, drove him from Manhattan to Philadelphia and abandoned him on an empty street shortly after midnight, satisfies the definition of abduction based on secreting or holding the victim in a place where he was not likely to be found (*see* Penal Law § 135.00 [2] [a]).

We reject defendants' argument that a car on a public thoroughfare may not, as a matter of law, be considered "a place where [the victim] is not likely to be found" (Penal Law § 135.00 [2] [a]). The question of whether the car was a place where Lawson was unlikely to be found was properly submitted to the jury, and the evidence was legally sufficient to support the jury's finding. As was the case in *People v Salimi* (159 AD2d 658 [2d Dept 1990], *lv denied* 76 NY2d 742 [1990]), a car traveling through public streets in the middle of the night may be found to be a place where the victim was not likely to be found, particularly where the victim lacked any means of calling for help while held there. This situation is a far cry from cases where the victim is in the presence of third parties and in a location where she was known, as was the case in *Matter of Luis V.* (216 AD2d 15, 15-16 [1st Dept 1995], *lv dismissed* 86 NY2d 838 [1995], *lv denied* 87 NY2d 803 [1995]).

Since defendants took Lawson and stranded him in a deserted location far from home, it was appropriate to infer that it was their intent to prevent him from being found as they made their way by car to Philadelphia. The alternative intent defendants posit, that they could have sought merely to get Lawson away from the apartment so they could prepare the room for the new renter, but could have been indifferent about whether Lawson could be found while in their car, not only verges on the nonsensical given how and where they transported him, but in any event, is merely an alternative proposal to submit to the finder of fact; it does not provide grounds for reversal of defendants' kidnapping convictions.

Defendants suggest that a car may only be treated as a place where the victim is "not likely to be found" if (1) the defendant used or threatened to use a weapon to put or keep the victim in the vehicle, (2) the defendant used the vehicle to take the victim to a secluded place, or (3) the victim was not visible to the public within the car. However, neither Penal Law § 135.00 (2) nor any case law imposes such requirements of proof. Even if there was a requirement that the victim not be visible to the public, it was satisfied since no one else had any way of know-

ing that Lawson was being conveyed in defendants' car to Philadelphia, since defendants prevented Lawson from calling for help, and since the car was driving down the New Jersey Turnpike late on a Tuesday night, making Lawson unlikely to be found or observed by any interested individuals during that time. Moreover, while there is no requirement that the victim have been brought to a secluded or isolated place, a deserted street corner in a city where he knew no one would qualify in any event.

Finally, there is no basis for applying the merger doctrine here. The doctrine only requires overturning kidnapping convictions where the "kidnapping [was] based on acts which are so much the part of another substantive crime that the substantive crime could not have been committed without such acts" (*People v Stuckey*, 56 AD2d 898, 898 [2d Dept 1977] [internal quotation marks and emphasis omitted]; *see also People v Palmer*, 50 AD2d 839 [2d Dept 1975]). This is not such a case.

■ The court correctly declined to submit second-degree unlawful imprisonment to the jury as a lesser included offense of second-degree kidnapping. A defendant is entitled to a charge on a lesser included offense only if he meets the two-pronged test set forth in *People v Glover* (57 NY2d 61, 64 [1982]; *see People v Rivera*, 23 NY3d 112, 120 [2014]). First, it must be theoretically impossible to commit the greater crime without at the same time committing the lesser (*see* CPL 1.20 [37]; *Glover*, 57 NY2d at 63-64). Second, there must be a "reasonable view of the evidence," viewed in the light most favorable to the defendant, upon which a jury could find that the defendant committed the lesser offense but not the greater (*see Glover*, 57 NY2d at 63). In assessing the second prong, there must be "some identifiable, rational basis on which the jury could reject a portion of the [evidence] which is indispensable to establishment of the higher crime and yet accept so much of the proof as would establish the lesser crime" (*People v Scarborough*, 49 NY2d 364, 369-370 [1980]).

With respect to the charges at issue here, a person is guilty of second-degree unlawful imprisonment "when he restrains another person" (Penal Law § 135.05). Thus, for unlawful imprisonment to be a viable lesser included offense, the victim must have been "restrained" as defined in Penal Law § 135.00 (1), without having been "abducted" as defined in Penal Law § 135.00 (2). Defendants maintain that there was a reasonable

view of the evidence that they restrained Lawson as required to establish unlawful imprisonment, but did not abduct him, in that no gun was used, they did not hold or secrete Lawson in a place where he was not likely to be found, and although they interfered substantially with his liberty they did not intend to prevent his liberation.

Unlawful imprisonment does not qualify here as a lesser included offense of the kidnapping charge, because there was no reasonable view of the evidence that defendants unlawfully imprisoned Lawson but did not kidnap him. In particular, there was no reasonable view of the evidence that defendants moved Lawson from one place to another without restraining him in a place where he was unlikely to be found, or that defendants held him in the car without intending to prevent his liberation. Defendants *necessarily* intended to prevent Lawson's liberation while they drove on the New Jersey Turnpike, since his liberation would have interfered with their plan to get him out of the apartment and move a new tenant in.

It is noteworthy that defendants did not argue in summation that the People failed to establish these elements of kidnapping, and they did not present evidence in support of any such theory. Instead, defendants claimed that no restraint had occurred at all and that Lawson had asked them to drive him to Philadelphia. Both Calvin and Diann testified that Calvin promised to drive Lawson there as a ploy to get him out of the apartment, and that Lawson then talked Calvin into following through on that promise. Defendants did not argue to the jury that even if Lawson was forced into the car, some of the elements of second-degree kidnapping had not been established.

As to Diann's robbery conviction, there was ample evidence to permit the finding of her accessorial liability for second-degree robbery. Both Diann and Calvin were convicted of second-degree robbery under Penal Law § 160.10 (1), for forcibly stealing property while "aided by another person actually present." When one person engages in conduct that constitutes an offense, another person is criminally liable for such conduct "when, acting with the mental culpability required for the commission thereof, he solicits, requests, commands, importunes, or intentionally aids such person to engage in such conduct" (Penal Law § 20.00).

Lawson testified that both Calvin and Diann bound him with duct tape, so although it was only Calvin who physically took his cell phone and wallet, the evidence permitted the inference

that it was both defendants' purpose to steal Lawson's cell phone and wallet as part of their joint plan to leave him stranded and unable to quickly obtain help. The role that Diann played in the execution of their plan provided sufficient evidence of a common purpose and a collective objective with Calvin (*see People v Cabey*, 85 NY2d 417, 422 [1995]).

Accordingly, the judgments of the Supreme Court, New York County (Bonnie G. Wittner, J.), rendered August 14, 2015, convicting defendant Diann Grohoske of kidnapping in the second degree and robbery in the second degree, and sentencing her to an aggregate term of five years, and convicting defendant Calvin Grohoske of kidnapping in the second degree and two counts of robbery in the second degree, and sentencing him to an aggregate term of nine years, should be affirmed, and the matter remitted to Supreme Court for further proceedings pursuant to CPL 460.50 (5) as to Diann Grohoske.

FRIEDMAN, J.P., RENWICK and GISCHE, JJ., concur.

Judgments, Supreme Court, New York County, rendered August 14, 2015, affirmed. The matter is remitted to Supreme Court for further proceedings pursuant to CPL 460.50 (5) as to Diann Grohoske.